# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| MAGUIRE FINANCIAL, LP, on Behalf of Itself and All Others Similarly Situated, | **Civil Action No. 4:14-cv-00092-D** |
| Plaintiff, | |
| v. | **CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** |
| POWERSECURE INTERNATIONAL, INC., SIDNEY HINTON, and CHRISTOPHER T. HUTTER, | **JURY TRIAL DEMANDED** |
| Defendants. | |

1.      Plaintiff Maguire Financial, LP ("Plaintiff") brings this federal securities class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure, on behalf of purchasers of PowerSecure International, Inc. ("PowerSecure" or the "Company") common stock and call options and sellers of put options between August 8, 2013 and May 7, 2014 (the "Class Period"), against PowerSecure; its President, Chief Executive Officer ("CEO"), and member of the Company's Board of Directors, Sidney Hinton; and its former Chief Financial Officer ("CFO"), Christopher T. Hutter (the "Individual Defendants" and with PowerSecure, "Defendants"), for violations of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder by the United States Securities and Exchange Commission ("SEC").

2.      Plaintiff alleges the following based upon the investigation of Plaintiff's counsel, which included a review of SEC filings by PowerSecure, securities analysts' reports and advisories about the Company, press releases and other public statements issued by the Company and its executives, media reports about PowerSecure, and interviews with confidential witnesses ("CW(s)"), including former PowerSecure employees, who held positions that provided them

with personal access to the information they reported. Additional facts supporting the allegations contained herein are known only to Defendants or are exclusively within their control. Plaintiff believes that additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## OVERVIEW

3.    PowerSecure, based in Wake Forest, North Carolina, provides utility and energy technologies to electric utilities and their industrial, institutional, and commercial customers. PowerSecure provides products and services through its three operating segments: Interactive Distributed Generation ("DG"); Energy Efficiency ("EE"); and Utility Infrastructure ("UI"). According to PowerSecure:

- Our Distributed Generation solutions involve manufacturing, installing and operating electric generation equipment "on site" at a facility where power is used, including commercial, institutional and industrial operations. Our systems provide a highly dependable backup power supply during power outages, and provide a more efficient and environmentally friendly source of power during high cost periods of peak power demand.

- Our Utility Infrastructure solutions are focused on helping electric utilities design, build, upgrade and maintain infrastructure that enhances the efficiency of their grid systems. Our products and services include transmission and distribution system construction and maintenance, installation of advanced metering and efficient lighting, and emergency storm restoration. Additionally, we provide utilities with a wide range of engineering and design services, as well as consulting services for cybersecurity compliance, and regulatory and rate design matters.

- We deliver Energy Efficiency solutions to assist our customers in the achievement of their energy efficiency goals.

4.    For 2013, DG generated revenues of about $112 million (about 41% of total revenues), UI also generated revenues of about $112 million (about 41% of total revenues), and EE produced revenues of about $47 million (about 17% of total revenues).

2

5.  Historically, PowerSecure's revenues generally have been dependent on large contracts with a small number of customers. The Company's 2013 10-K explains: "[F]rom time to time, we have derived a significant portion of a particular period's revenues from a concentrated group of customers, because a significant portion of our revenues in any particular period can be driven by one or more large projects." A Lake Street Capital Markets ("Lake Street") PowerSecure Institutional Equity Research report (Aug. 8, 2013) noted: "A meaningful portion of PowerSecure's revenue is dependent on large contracts from a small number of customers. The loss of a large customer or the failure to secure future large customers could have a negative impact on financial results." Defendants, therefore, were cognizant during the Class Period that the loss of, or the completion of work on orders from, a large customer, or the failure to secure a new large customer the Company was working to obtain, would have a material negative impact on the Company's business and operating results.

6.  During the Class Period, Defendants reported record results, assuring investors that they were taking measures to "ensure" the continuation of successful results throughout the Class Period and beyond, including by bringing in substantial new business and by expanding their business relationships with their current customers.

7.  Defendants highlighted multiple business "wins" (as referred to by Defendants) during the Class Period, but were always careful to avoid identifying their customers by name. For example, in November 2013, Defendant Hinton announced "a major new utility infrastructure win that has the potential—this is significant. I want to be very clear, this win has the potential to be the largest contract that PowerSecure has ever won. It's one – the contract is with one of the largest electric utilities in the country. . . ." Investors thus had no means of

3

conducting independent due diligence as to these unnamed customers or of otherwise evaluating the value or *bona fides* of the deals, but were forced to take the Defendants at their word.

8.     As explained herein, Defendants continually emphasized their "record revenues," increasing earnings, and "record backlog" in various statements throughout the Class Period and concurrently with their quarterly results announcements.  Defendants stated that these "record" results demonstrated the Company's "continuing growth," that the Company was on track to achieve "2014 gross margins . . . in the mid to high 20s," that it was "scaling" revenues "quickly to 300M target in 2015," and the Company was on track to "meet its goal of implied EPS [of] $1.10-$1.30 in 2015."

9.     Based on Defendants' assurances, the market for PowerSecure's securities became artificially inflated just in time for the Company's registered stock offering on or about August 21, 2013.  The Company was able to issue and sell 2.3 million shares to the public for more than $34 million in net proceeds.

10.     However, beginning at the end of the second quarter of 2013, and unbeknownst to investors, PowerSecure was encountering significant operational issues and inefficiencies arising from, *inter alia*, the following facts:

- PowerSecure lost a UI contract renewal in a particular geographic area it had serviced for approximately three years and, instead, obtained a new contract from that customer that, unbeknownst to the public, required PowerSecure to change the location of the work performed.  Despite knowing this risk that it could not receive the contract renewal in the same location, PowerSecure invested heavily in crews and equipment in one particular location, knowing that the investment would not be transferrable to another location, and that, if the work did not

4

materialize, or if the work was reallocated to a different geographic service area (as occurred at the end of the second quarter of 2013), the crews it trained would go to work for PowerSecure's competitor in that location and would not relocate to the new work site. PowerSecure, however, did not disclose these material risks to investors.

- In addition, to service a new location, aside from losing its trained crews, PowerSecure was required to undertake the expense of hiring and training new crews to complete the work that was reallocated to the new location in order to service the contract.

- Further, PowerSecure was retaining certain of its trained crews and equipment in anticipation of being selected for a potential UI contract with a new customer, the scope of which Defendants were "guessing" was significantly larger than it was, incurring significant expenses without any reasonable expectation of return on the investment.

- The Company was also experiencing much longer sales cycles in its DG segment as it sought to close larger opportunities, and, undisclosed to the investing public, was intentionally foregoing smaller projects, which it was able to turn around faster, that previously had provided a steady revenue flow for that core segment.

- Despite the fact that Defendants knew, by the start of the Class Period, that the Company was facing the issues described above, they failed to disclose them and represented that PowerSecure was on target to continue record earnings throughout the Class Period and beyond.

5

As a result of the foregoing undisclosed issues, PowerSecure experienced under-utilization of its labor and other substantial inefficiencies in its UI segment, significantly increased operational costs, decreased operating margins, and decreased profits during the Class Period. Despite knowing this information, Defendants continued to make unrealistic, positive representations concerning the Company's performance and prospects and to represent unrealistic future revenues and profits from new contracts that Defendants later admitted at the end of the Class Period did not have any reasonable basis but were just guesses.

11.     Further obscuring the truth – and investors' ability to perceive it – during the Class Period, Defendants refused to report detailed financial information for the Company's multiple operating segments, attracting the attention of the SEC, which sent numerous letters to Defendant Hinton requesting clarification of PowerSecure's position. Although the SEC ultimately did not take any action on the matter, PowerSecure changed this practice following the Class Period. In the November 5, 2014 Form 10-Q, PowerSecure stated:

> These three reportable segments, described in greater detail above, had previously been reported on a combined basis under our Utility and Energy Technologies segment as they had been operated and evaluated as one operating segment. We experienced significant growth over the last several years in most of our product and service areas. As we have grown organically, and as we have added to our capabilities through acquisitions, our product and service areas have become more distinctly organized under these three groupings. In addition, our CODM has begun reviewing results and allocating resources among these three strategic business groupings, and we have begun budgeting using these business segments. Our segment information for the three and nine month periods ended September 30, 2013 have been reclassified to conform to our current presentation.

12.     The true facts of PowerSecure's operational difficulties were not revealed until the end of the Class Period, May 7, 2014, when, after the close of trading, the Company announced its first quarter 2014 financial results, reporting a net *loss* for the quarter, and revealing for the first time that it was experiencing under-utilized labor and other inefficiencies

in the UI segment and elongated sales cycles in the DG segment, which were blamed for the disastrous first quarter 2014 results and dramatically lower future profit outlook.

13.    In response to this shocking material adverse information, PowerSecure's stock plunged by more than 62%, erasing more than $250 million in market capitalization, to close at just $7.00 per share on May 8, 2014 (the day immediately following the end of the Class Period), on unusually high trading volume.

14.    In addition to PowerSecure's raising over $34 million through a public offering of its common stock at $16 per share during the Class Period, concurrent with that offering, Defendant Hinton also sold 200,000 of his own personally-held shares (approximately 30% of all of his holdings) for $3.2 million. Hinton made no purchases of PowerSecure securities in 2013 or 2014, even though he purchased 10,000 shares in each of the years 2012, 2011, and 2010.

15.    Further, PowerSecure had traditionally engaged in numerous acquisitions to grow its business. Indeed, PowerSecure acquired Lime Energy's energy services support ("ESCO") business and Solais Lighting Co. in March and April 2013, respectively.   PowerSecure often used its stock as currency for such acquisitions, including as part of the consideration for its Solais Lighting purchase.  Thus, PowerSecure's ability to conduct additional acquisitions was dependent on keeping the price of its common stock as high as possible.  Thus, Defendants had cognizable and compelling personal pecuniary motives to conceal the rising tide of problems facing PowerSecure during the Class Period and to lead the investment community to believe all was well, that the Company was healthy, prosperous, and growing and that its securities were worth their quoted market value when, in fact, the opposite was true.

## JURISDICTION AND VENUE

16.    The claims asserted herein arise under Section 10(b) and Section 20(a) of the

Exchange Act, 15 U.S.C. §§78j(b), 78t(a), and 78t(b), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. §240.10b-5.

17.   This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§1331 and 1337, and Section 27 of the Exchange Act.

18.   Venue is proper in this Court pursuant to 28 U.S.C. §1391(a) and Section 27 of the Exchange Act because: (i) one or more of the Defendants resides and transacts business in this District; and (ii) a substantial portion of the transactions and wrongs complained of herein, including Defendants' primary participation in the wrongful acts detailed herein, occurred in this District.

## PARTIES

### A.   Plaintiff

19.   Lead Plaintiff Maguire Financial, LP ("Plaintiff") purchased PowerSecure common stock and sold PowerSecure put options, in reliance on Defendants' false and/or misleading statements and omissions of material facts and/or the integrity of the market for PowerSecure securities, at artificially inflated prices during the Class Period, and suffered economic loss and damages when the truth about PowerSecure that was misrepresented and omitted during the Class Period was revealed. Plaintiff's Certification with a detailed listing of its transactions in PowerSecure securities during the Class Period is attached hereto as Exhibit A.

### B.   Defendants

20.   Defendant PowerSecure is incorporated in Delaware and maintains its principal place of business at 1609 Heritage Commerce Court, Wake Forest North Carolina 27587-4245. As explained above, PowerSecure provides products and services to electric utilities and to their commercial, institutional, and industrial customers in the United States. During the Class Period,

PowerSecure had more than 21 million shares of common stock outstanding, which traded in efficient markets, including the NASDAQ Global Select Market until August 28, 2013, and then the NYSE thereafter, under the ticker symbol "POWR."

21. Defendant Hinton is, and was, during the Class Period, PowerSecure's CEO and President. Defendant Hinton also served as a member of the Board of Directors. According to the PowerSecure website, Defendant Hinton has served as PowerSecure's President and CEO since April 2007 and as a member of the Board of Directors since June 2007. Defendant Hinton has also served as the President and CEO of PowerSecure, Inc., PowerSecure's core operating subsidiary, since its incorporation in September 2000. In 1999, Defendant. Hinton was the Vice President of Market Planning and Research for Carolina Power & Light (now known as Progress Energy). From August 1997 until December 1998, he was the President and CEO of IllumElex Lighting Company, a national lighting company. From 1982 until 1997, Defendant Hinton was employed in several positions with Southern Company and Georgia Power Company. Defendant Hinton has vast experience in the utility and power generation business. During the Class Period, Defendant Hinton personally certified PowerSecure's financial reports and signed the SEC Form 10-K for 2013, filed on March 10, 2014 ("2013 10-K"), and the Form 10-Q filings. In addition, Defendant Hinton was PowerSecure's chief spokesman to the press, Wall Street community, and investors during the Class Period, and spoke on investor conference calls.

22. Defendant Hutter was, during the Class Period, the CFO of PowerSecure, as well as Executive Vice President, Secretary, and Treasurer. According to the PowerSecure website, Defendant Hutter joined PowerSecure International, Inc. as CFO in December 2007 and previously was National Vice President, Finance, Treasurer, Investor Relations, and Assistant Secretary of ADVO, Inc., an NYSE-listed $1.5 billion media and marketing services company.

9

Prior to joining ADVO in 1993, Defendant Hutter, a CPA, was a tax consultant with Deloitte & Touche. A *magna cum laude* graduate of Case Western Reserve University with a BS in accounting, Defendant Hutter also earned an MBA from Duke University's Fuqua School of Business. On August 28, 2014, Hutter informed the Company that he intended to resign his positions as Executive Vice President, CFO, Secretary, and Treasurer, effective as of early November 2014, but on November 13, 2014, it was announced that Defendant Hutter would be appointed the Chief Operating Officer ("COO") of the Company. During the Class Period, Defendant Hutter signed the 2013 10-K, and the Company's Form 10-Q and Form 8-K filings, and spoke on investor conference calls.

23.     During the Class Period, as senior executive officers (and in Hinton's case, also a Director) of PowerSecure, the Individual Defendants were privy to confidential and proprietary information concerning PowerSecure, its operations, performance, finances, financial condition, and present and future business prospects. Because of their positions with PowerSecure, the Individual Defendants had access to non-public information about its business, finances, products, markets, and present and future business prospects, via access to internal corporate documents, conversations, and connections with other corporate officers and employees, attendance at management and board of directors meetings and committees thereof and via reports and other information provided to them in connection therewith. Because of their possession of such information, the Individual Defendants knew or recklessly disregarded the fact that adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

24.     The Individual Defendants are liable, both as direct participants and as co-conspirators, for the wrongs complained of herein. In addition, by reason of their status as senior

executives and/or directors, the Individual Defendants were "controlling persons" within the meaning of Section 20 of the Exchange Act and had the power and influence to cause the Company to engage in the unlawful conduct complained of herein. Because of their positions of control, the Individual Defendants, directly or indirectly, controlled the conduct of PowerSecure's business and its public statements.

25.     The Individual Defendants, because of their positions with the Company, controlled and/or possessed the authority to control the contents of its reports, press releases and presentations to common stock analysts and, through them, to the investing public. The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading, prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Thus, the Individual Defendants had the opportunity to, and did, commit the fraudulent acts alleged herein.

26.     As senior executive officers and/or directors and as controlling persons of a publicly traded company whose shares of securities were, and continue to be, registered with the SEC pursuant to the Exchange Act and its securities traded on the NYSE (and previously, the NASDAQ Global Select Market) under the ticker symbol "POWR," the Individual Defendants were, and continue to be, governed by the federal securities laws, and had a duty to disseminate promptly accurate and truthful information with respect to PowerSecure's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings, and present and future business prospects; and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of PowerSecure's securities would be based upon truthful and accurate information. The Individual

11

Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

27.     The Individual Defendants are liable as participants in a fraudulent scheme and course of conduct that operated as a fraud or deceit on purchasers of PowerSecure securities by disseminating materially false and/or misleading statements and/or concealing material adverse facts.   The scheme: (i) deceived the investing public regarding PowerSecure's business, operations, performance, and prospects, as well as the intrinsic value of PowerSecure's shares, and (ii) caused Plaintiff and members of the Class to purchase PowerSecure securities at artificially inflated prices that, when the truth was revealed, declined enormously in value as a result.

## DEFENDANTS' MATERIALLY FALSE AND/OR MISLEADING STATEMENTS AND OMISSIONS DURING THE CLASS PERIOD

28.     Throughout the Class Period, PowerSecure made materially false and/or misleading statements and omissions regarding a new contract with a significant customer that changed the location of the work PowerSecure was to perform, the significant amount of business from the new UI customer that Defendants announced, operational inefficiencies affecting PowerSecure's UI business, and PowerSecure's decision to slow down the growth of the DG segment.

29.     On August 7, 2013, the first day of the Class Period, PowerSecure filed with the SEC a Form 10-Q for the quarterly period ended June 30, 2013.   On that same date, PowerSecure issued a press release, filed with a Form 8-K signed by Defendant Hutter, announcing its financial results for the quarter that stated, in part, the following:

> "***Our record second quarter results and all time high backlog illustrate the continued momentum we are seeing across our business*** as we deliver differentiated, best-in-class solutions to our customers. In addition, we are very

12

pleased with the strong performance of our two most recent acquisitions out of the gate, as our new ESCO and Solais businesses delivered second quarter revenues of $12.3 million and $1.6 million, respectively," said Sidney Hinton, chief executive officer of PowerSecure.

"With increasing revenues and EPS, a strong balance sheet, growing EBITDA from operations, a backlog that has grown even faster than our revenues, and added strength from our recent strategic acquisitions, *PowerSecure has never been in a stronger position for long term success*," Hinton added.[1]

a. The statement, "Our record second quarter results and all time high backlog illustrate the continued momentum we are seeing across our business as we deliver differentiated, best-in-class solutions to our customers" was materially false and/or misleading when made because Defendants misrepresented and failed to adequately disclose that Defendants were not seeing "continued momentum" across PowerSecure's businesses; rather, PowerSecure was seeing significant and financially draining operational inefficiencies and other problems that inevitably would have a negative impact on revenues and profits.

b. The statement that "PowerSecure has never been in a stronger position for long term success" was materially false and misleading when made because Defendants misrepresented and failed to adequately disclose that PowerSecure's was experiencing significant and financially draining operational inefficiencies and other problems that inevitably would have a negative impact on revenues and profits.

c. The statement "With increasing revenues and EPS, a strong balance sheet, growing EBITDA from operations, a backlog that has grown even faster than our revenues, and added strength from our recent strategic acquisitions, PowerSecure has never been in a stronger position for long term success" was materially false and/or misleading when made because, by August 7, 2013, Defendants knew and/or recklessly disregarded the facts available to them that,

---

[1] All emphasis is added unless noted otherwise.

among other things, they had no reasonable basis to believe that PowerSecure's revenues and EPS would continue to increase, and/or that EBITDA from operations would grow; rather, PowerSecure was experiencing significant and financially draining operational inefficiencies and other problems that inevitably would have a negative impact on revenues and profits.

30. Later that day, PowerSecure hosted a conference call and live webcast for securities analysts and investors regarding the financial results. Defendants Hinton and Hutter spoke for the Company. In his opening remarks, Defendant Hinton stated:

> Moving on, let me talk about our utility infrastructure business, and the 133% year-over-year growth. *It just tells you how strong the business is for us, and our prospects for this business for continued growth look very, very good.*

31. Defendant Hinton further stated, in pertinent part, as follows:

> Summarizing this year so far, we are very happy with the results. We've got – and while we are very happy, *we have got our foot on the gas to ensure our continued success in the second half of this year and in 2014 and in 2015 and beyond*, as we see exceptional growth opportunities all across our businesses. *We've just completed a detailed midyear quarterly business reviews, and the picture of – and seeing our first picture of 2014. And I can tell you that as it comes under focus, it looks promising.*

32. Defendant Hinton's positive representations concerning the strength of the Company's business, including its UI business, and its prospects for continued growth, including his assurances that "the same drivers for this business [UI] that we have seen over the past few quarters remain strong" and that "we have got our foot on the gas to ensure our continued success in the second half of this year and in 2014 and 2015 and beyond," were materially false and misleading when made, and lacked a reasonable basis, because Defendants misrepresented and failed to disclose adequately that there was no reasonable basis to believe that continued success was "ensured" and/or that 2014 or 2015 looked promising following a detailed business review. PowerSecure did not have its "foot on the gas." Rather, PowerSecure was experiencing significant and financially draining operational inefficiencies and other problems that inevitably

14

would have a negative impact on revenues and profits that were not disclosed and that rendered Defendants' statement "ensuring [PowerSecure's] continuing success" in 2014 and 2015 false, misleading, and lacking in any reasonable basis in fact.

33.     On the same August 7, 2013 conference call, Defendant Hinton discussed the Company's utility infrastructure business (UI), stating, in pertinent part, as follows:

> Moving on, let me talk about our utility infrastructure business and the 133% year-over-year growth. *It just tells you how strong the business is for us and our prospects for this business, for continued growth look very, very good.* We signaled to you on our last conference call in June that we expected good things, and then *we were blessed to announce securing a $49 million three-year contract renewal,* both the renewal and expansion, with one of the largest investor on utilities in the country, and that business is now reflected in our backlog.

> \*     \*     \*

> Moving on, *the same drivers for this business that we have seen over the past few quarters remain strong,* with a combination of transmission and distribution work from an ever expanding list of large utilities, as well as expanding work assignments in the utilities we are already serving, as well as additional growth from other energy companies; i.e., non-utilities to build new T&D infrastructure to serve the shale gas operations relative to the energy companies. *We expect our utility infrastructure to remain very healthy throughout 2013 and 2014.*

34.     The foregoing statements "It just tells you how strong the business is for us, and our prospects for this business, for continued growth look very, very good," and "the same drivers for this business that we have seen over the past few quarters remain strong" were materially false and/or misleading when made because they misrepresented and failed to adequately disclose the following:

a.     The UI business was not strong for PowerSecure when the statement was made, nor did its prospects for the UI business and continued growth look very, very good; rather, PowerSecure was experiencing significant and financially draining operational

15

inefficiencies and other problems that inevitably would have a negative impact on revenues and profits.

b.  The same drivers for the UI business that they had seen over the past few quarters did not remain strong, because PowerSecure had not, in fact, received a "renewal" of its prior three year contract. Rather, it received a new contract in a new, distant location from an existing customer and lost the contract with that customer in the location it had previously serviced. As a result of this relocation, PowerSecure was forced to hire and train new workers at great expense and essentially start over.

c.  Defendants had no reasonable basis to expect PowerSecure was in a position to profit significantly from the expansion of work assignments in the utilities it was already serving because Defendants knew or recklessly disregarded that assignments from those utilities had flattened and significant and financially draining operational efficiencies were putting downward pressure on PowerSecure's profit margins.

d.  Defendants had no reasonable basis in fact to expect PowerSecure's UI business to remain very healthy throughout 2013 and 2014 because Defendants knew or recklessly disregarded that assignments from those utilities had flattened and significant and financially draining operational efficiencies were putting downward pressure on PowerSecure's profit margins.

e.  One of PowerSecure's large UI customers that had contracted with the Company to perform high-margin utility infrastructure work at a certain location had reallocated the work to be performed at another location, thereby replacing the contract with lower-margin work at a more distant location that was certain to negatively affect profits from that new contract (which replaced an existing profitable contract) for the foreseeable future.

f.      Further, as a result of the reallocation, the Company would lose the capital spent hiring and training the crews in the original location and the personnel would leave PowerSecure to work for a competitor.

g.      PowerSecure was retaining certain of its trained crews in anticipation of being selected for a potential UI opportunity with a new customer, the scope of which Defendants were "guessing" was significantly larger than it was, incurring significant expenses without any reasonable expectation of return on the investment.

h.      As a result of the Company's shift in strategy regarding its DG business, to actively seek out larger business opportunities while neglecting its smaller projects that turn over faster and had previously provided a steady revenue flow for its core segment, it was experiencing longer sales cycles and thus one of PowerSecure's "drivers" of its prior success could no longer be expected to generate the cash flow or profits it had previously.

35.      During the same August 7, 2013 call, Defendants Hinton and Hutter, in a question and answer session with securities analysts, led investors to believe that PowerSecure would continue to grow:

**Eric Stine - Craig-Hallum Capital**

Just along those lines, can you just give an update on maybe the number of customers, utility customers that you are doing business with, whether that has expanded? And also, I don't know if you're willing to provide the number of oil and gas customers that you are working for?

**Sidney Hinton - CEO**

I would say that the number of customers we supply – we're providing to in both of those segments has expanded. I would say our growth is driven by our expansion of serving our existing customers. In other words, that's the fruit we are eating today. But we are blessed to see Ronnie and his team do an unbelievable job out, working with customers. Our references are through the roof, and that has blessed us. One is the opportunity to serve even more customers. Hopefully that's helpful.

**Chris Hutter - CFO**

Eric, I would just add, the thrust to the revenue and the revenue growth are those core investor on utilities. The incremental revenue, that's just added to that growth, has enhanced that growth is from the large energy companies.

**Eric Stine - Craig-Hallum Capital**

But, I mean, just an idea – and I know you maybe don't want to provide too many details, but I mean, is this still – with the energy companies, is it still just a handful, and you think that this can be more than a handful over time?

**Sidney Hinton - CEO**

I wouldn't say more than a handful, it might be, but it's a tremendous amount of opportunity out there to serve. I mean, our people have done a phenomenal job doing that.

**Eric Stine - Craig-Hallum Capital**

Okay. So similar dynamic that where you can expand within their operations?

**Sidney Hinton - CEO**

*Oh yes. Yeah.*

**Eric Stine - Craig-Hallum Capital**

Okay. Maybe next one for me, just on the large project opportunity side. I know you have talked about this more and more in the last few calls, and you announced one of them in the last few months. But just, what you are seeing in terms of the large project opportunities out there, is it skewed towards a specific segment, or is it across the whole – all the business lines?

**Sidney Hinton - CEO**

I would say, first, it's definitely across all the business lines. Maybe a slight skewing, the biggest opportunities are in utility infrastructure just because that's the biggest spend. Those customers are committed to spending a lot of money. So your pipeline is bigger there with some really big opportunities. But we are seeing it across all the businesses. In general, I would say, the pipeline – our backlog is at a record, now, I'd say the pipeline is at a record too. Just in terms of quality and breadth and quantity, it's – we're in a really good spot.

36.     As the foregoing demonstrated, Defendants refused to provide specifics regarding

customers and contracts but repeatedly emphasized the growth in same-customer business

expansion and the opportunities for PowerSecure in large projects while claiming to maintain its pursuit of smaller "quality" contracts. The forgoing responses to the analyst's questions were false and misleading because, for the reasons discussed above, Defendants knowingly or recklessly failed and omitted to disclose that (a) its existing contracts were flattening out; (b) that it had not been renewed (as it represented) for a contract in the same location it had previously served one of its larger customers but was awarded a new contract from that customer in a different, distant location, requiring PowerSecure to abandon its investment in its trained employees in the original location and to re-start operations from scratch in the new location; (c) that it had intentionally sacrificed DG business, to actively seek out larger business opportunities, which would inevitably cost PowerSecure smaller projects that turn over faster and had previously provided a steady revenue flow for its core segment; (d) that PowerSecure was experiencing longer sales cycles; (e) that it was retaining idle crews in locations at great expense in hopes of obtaining new contracts that it had no reason to believe would materialize or that the services required would justify the cost of maintaining the costly servicing infrastructure it was maintaining; and that PowerSecure was experiencing significant and financially draining operational inefficiencies and other problems that inevitably would have a negative impact on revenues and profits.

37. In response to Defendants' positive statements, on the next day, August 8, 2013, PowerSecure common stock rose $1.74 per share, more than 10%, to close at $17.71 per share, on unusual volume of more than 1.1 million shares. During the Class Period, the average daily trading volume of PowerSecure common stock was about 256,426 shares. The same day that PowerSecure shares rose more than 10%, the NASDAQ Composite rose less than 0.50%.

38.     On August 16, 2013, benefiting from the positive pronouncements on August 7, 2013, PowerSecure sold 2.3 million shares of its common stock in a public offering at $16 per share, yielding net proceeds of $34.4 million (the "Company Offering"). The Company Offering was underwritten by investment bankers Robert W. Baird & Co. ("Baird"), Craig-Hallum Capital Group ("Craig-Hallum"), Roth Capital Partners ("Roth"), Lake Street, and Maxim Group ("Maxim"). Concurrently on August 16, 2013, Defendant Hinton sold 200,000 shares of PowerSecure common stock from his personal holdings (approximately 30% of his total holdings) in a public offering at the same price and on the same terms as the Company Offering, which yielded him $3.2 million in proceeds (the "Hinton Offering"). The Company Offering and the Hinton Offering closed on August 21, 2013.

39.     The Registration Statement on SEC Form S-3, the Prospectus, and the Prospectus Supplement used to conduct the Company Offering were materially false and misleading because they failed to disclose adequately the severe operational and other difficulties the Company was experiencing at the time, as further detailed herein. The Registration Statement was signed by Defendants Hinton and Hutter.

40.     On November 6, 2013, PowerSecure issued a press release attached to an SEC Form 8-K filed by PowerSecure and signed by Defendant Hutter, announcing its third quarter 2014 financial results for the period ended September 30, 2013. The Company reported, in pertinent part:

> Gross margin as a percentage of revenue was 26.3 percent in 3Q 2013 compared to 31.4 percent in 3Q 2012. The y-o-y gross margin decrease was due to the growth of our utility infrastructure, solar, and ESCO revenues in 3Q 2013, which are generally our lowest gross margin product and service categories. *In addition, we realized inefficiencies in our utility infrastructure unit related to the advanced deployment of crews in anticipation of being selected for a significant long-term revenue opportunity with a major new utility partner. We anticipate some continued inefficiencies from these excess crews to negatively impact our*

*gross margins during the fourth quarter of 2013 and the first quarter of 2014*. A separate press release announcing our selection for this opportunity was issued today in conjunction with this earnings release.

*     *     *

Operating expenses for 3Q 2013 as a percentage of our revenues were 19.0 percent, a decrease of 11.2 percentage points on a GAAP basis compared to 30.3 percent in 3Q 2012, and a decrease of 7.8 percentage points excluding the $1.5 million 3Q 2012 charge, as the company leveraged operating expenses against a greater level of revenues.

Operating expenses for 3Q 2013 were $15.5 million, compared to $13.4 million in 3Q 2012. Excluding the $1.5 million charge in 3Q 2012, operating expenses in 3Q 2012 were $11.8 million. The $3.7 million y-o-y increase in operating expenses consists primarily of $2.8 million of incremental operating expenses in 3Q 2013 related to our recent ESCO and Solais acquisitions. The remaining y-o-y increase in our operating expenses is primarily due to an increase in selling expenses related to our significantly higher revenues and backlog, depreciation from our investments in company-owned distributed generation systems and utility infrastructure equipment, and increases in personnel and equipment to drive and support our growth.

**Operating margin as a percentage of revenue increased 6.2 percentage points to 7.3 percent in 3Q 2013 from 1.1 percent in 3Q 2012. Excluding the 3Q 2012 charge, operating margin increased 2.7 percentage points. The increase in operating margin was a result of the significant revenue growth achieved with substantially lower growth in operating expenses.**

41.     The statements regarding inefficiencies in the utility infrastructure group and increases in operating margin and revenue growth were materially false and/or misleading when made because they misrepresented and failed to adequately disclose the following:

a.     Defendants had no reasonable basis to anticipate being selected for a significant long-term revenue opportunity with a major new utility partner that was sufficiently substantial to warrant continuing to incur inefficiencies in the UI unit related to the advanced deployment of crews, but were in fact only guessing as to the amount of work that might be assigned if the contract was awarded to PowerSecure.

21

b.    One of PowerSecure's large UI customers that had previously contracted with the Company to perform high-margin utility infrastructure work at a certain location had failed to renew its contract with PowerSecure in that location and, instead, had awarded PowerSecure a new contract in another location, thereby replacing the contract with lower-margin work at a more distant location.

c.    Further, as a result of the reallocation, the Company would lose the capital spent hiring and training the crews in the original location and the personnel would leave PowerSecure to work for a competitor.

d.    As a result of the reallocation, the Company was required to hire and train new crews in the new location in order to service the contract.

e.    PowerSecure was retaining certain of its trained crews in anticipation of being selected for a potential UI opportunity with a new customer, the scope of which Defendants were "guessing" was significantly larger than it was, incurring significant expenses without any reasonable expectation of return on the investment.

f.    PowerSecure's statement that it was experiencing unspecified inefficiencies was insufficient to describe the material impact that these inefficiencies were having on the Company's financial health.  Moreover, the statement was negated by Defendant Hinton's comments that it expected large volumes of work from a newly-announced customer, minimizing the effect, as described below.

g.    As a result of the Company's shift in strategy regarding its DG business, to actively seek out larger business opportunities while neglecting its smaller projects that turn over faster and had previously provided a steady revenue flow for its core segment, it was experiencing longer sales cycles.

42.     Also on November 6, 2013, the Company issued a press release, filed with SEC Form 8-K, that was signed by Defendant Hutter that included the statement, "Now that the utility has formally selected PowerSecure for this role, specific volumes of work will be determined in the coming quarters. The [C]ompany estimates that in 2014 and 2015 it could be asked to double its work volumes and could realize $25-$35 million of revenue annually from this expanded relationship." This statement was materially false and/or misleading when made because Defendants did not have any reasonable basis to believe that the announced "win" had the potential to be the largest contract that PowerSecure had ever won or that PowerSecure would be asked to double its work volumes to realize $25-$35 million annually from the relationship. Indeed, on a conference call on May 7, 2014 at the end of the Class Period (also on the May 7, 2014 conference call was Defendant Hutter), Defendant Hinton referenced this customer, conceding that they had no basis to represent this relationship would result in substantial work volumes and/or income, candidly stating, "it's a relatively new account and we just *guessed* wrong." Thus, PowerSecure was merely "guessing" when it made the statements, but Defendants failed to disclose that their estimate of the value of the new contract was not the product of a considered or professional estimation process, but just a "guess" made without any reasonable basis in fact. As such, the statement was materially false and misleading and omitted to states facts necessary under the circumstances in which it was made (*i.e.*, that Defendants were simply guessing) to make the statements regarding the value of the contract no false and misleading.

43.     Also on November 6, 2013, PowerSecure conducted a conference call with analysts and investors to discuss the Company's operations and third quarter 2013 results (also attended by Defendants Hinton and Hutter. Defendant Hinton made statements calculated and

intended to minimize the impact of the statement in the press release that "inefficiencies in [the Company's] utility infrastructure unit related to the advanced deployment of crews in anticipation of being selected for a significant long-term revenue opportunity with a major new utility partner," by, in part, emphasizing the work that PowerSecure would receive from the new UI customer would more than make up for the inefficiencies. He stated, in pertinent part:

> Our third quarter results **continued our tremendous momentum** in 2013 with another all time record for quarterly revenues and an additional 2.7 percentage points of operating margin expansion. Third quarter revenues of $81.5 million represent a 84% year-over-year growth. 55 of those percentage points come from organic growth. Despite the backlog consumption associated with our record quarter in the third quarter, **our new order flow has been strong, our backlog today stands at a very healthy $240 million which does not include the substantial new utility infrastructure opportunity that we announced this morning in a separate press release.**
>
> **The continued progression of our backlog positions us very strongly for continued growth** and one of the things you will hear us talk about in this call is that we feel very well positioned to achieve over $300 million in sales in 2014 as we go in a full ahead of what or strategic plan was.

44.    The foregoing statements that the "third quarter results continued our tremendous momentum in 2013," "our new order flow has been strong, our backlog today stands at a very healthy $240 million which does not include the substantial new utility infrastructure opportunity that we announced this morning in a separate press release," and "the continued progression of our backlog positions us very strongly for continued growth," were materially false and/or misleading when made because they misrepresented and failed to adequately disclose that:

   a.    Defendants did not actually know the amount of business that would be awarded to PowerSecure under the business agreement misleadingly described as "the substantial new utility infrastructure opportunity," and in fact had no reasonable basis to describe the business agreement in those terms, which, later, the Defendants conceded that the

"substantial" business opportunity was actually merely "a relatively new account and [they] just guessed wrong."

      b.     One of PowerSecure's large UI customers that had previously contracted with the Company to perform high-margin utility infrastructure work at a certain location had failed to renew its contract with PowerSecure in that location and, instead, had awarded PowerSecure a new contract in another location, thereby replacing the contract with lower-margin work at a more distant location.

      c.     Further, as a result of the reallocation, the Company would lose the capital spent hiring and training the crews in the original location and the personnel would leave PowerSecure to work for a competitor.

      d.     As a result of the reallocation, the Company was required to hire and train new crews in the new location in order to service the contract.

      e.     PowerSecure was retaining certain of its trained crews in anticipation of being selected for a potential UI opportunity with a new customer, the scope of which Defendants were "guessing" was significantly larger than it was, incurring significant expenses without any reasonable expectation of return on the investment.

      f.     PowerSecure's statement that it was experiencing unspecified inefficiencies was insufficient to describe the material impact that these inefficiencies were having on the Company's financial health. Moreover, the statement was negated by Defendant Hinton's comments that it expected large volumes of work from a newly-announced customer, minimizing the effect, as described below.

      g.     As a result of the Company's shift in strategy regarding its DG business, to actively seek out larger business opportunities while neglecting its smaller projects that turn

over faster and had previously provided a steady revenue flow for its core segment, it was experiencing longer sales cycles.

45. Also on the November 6, 2013 conference call, Defendants continued to assure investors regarding the large new business (and the purported reason for holding onto the crews that were hurting PowerSecure's bottom line). Defendant Hutter, in discussing the UI segment, stated that the reduced blended margins resulted in part from the Company having "held over some utility services crews in anticipation of winning the large utility services opportunity that [Defendants had] announced th[at] morning." Then, Defendant Hinton also discussed the UI segment and the anticipated work, stating, in pertinent part:

> Turning now to utility infrastructure which grew 72% year-over-year in the third quarter. Our excellent utility infrastructure growth is being driven by a combination of winning business with new utility partners and expanding our business with existing partners. We are also doing work – and working directly for energy companies, who are building out into shale platforms – building out the – utility infrastructure to serve those locations. And we are seeing more and more expansion of the customers we're blessed to serve there.
>
> **This morning we announced a major new utility infrastructure win that has the potential—this is significant. I want to be very clear, this win has the potential to be the largest contract that PowerSecure has ever won. It's one – the contract is with one of the largest electric utilities in the country and they have selected us as one of two new partners to provide transmission, infrastructure service on their power grid.**
>
> We began serving this utility customer on a limited basis in late 2012 and through our work this year and the strength we've recently added to our balance sheet, we've earned the opportunity to become a regular long-term service provider.
>
> Now that the utility has formally selected us for this role, specific volumes of ongoing work will be determined in the coming quarters. Based on our discussions with the utility, *we currently estimate that in 2014 and 2015 we could be asked to double our work volumes with them and as a result realize $25 million to $35 million of revenue annually from this expanded relationship.*
>
> I want to be clear though, we do not currently have the $25 million to $35 million of annual opportunity in our revenue backlog. The $240 million does not include that. We will add that to the backlog as we see specific volumes start to firm up. *. . . But the win of that business is highly significant to us. It's a huge deal for*

26

*us and something we've been strongly focused on this year*. As we completed several projects this summer we believed we were very well positioned to win this potential new business. So we maintained certain crews and equipment that were located in those geographies close to that utility. Let me be clear, we had a gap in the amount of what we had won and the work thought we would win. So we kept resources available to be able to win this work and ramp. It impacted our gross margins in the third quarter.

Candidly, we think it will impact our gross margins in the fourth quarter while we ramp up and maybe bleed over a little bit into the first quarter.

*But let me be clear, our work load is doubling. We will be doubling our resources there, we couldn't afford to pull back and then try to ramp up. It was definitely a case where it was best to keep our foot on the accelerator.* It cost us some money in the third quarter, it cost us a little in the fourth quarter *we got our foot on the pedal. It's a big pay off for us long-term and we really do believe this contract has the potential to be the largest contract we've ever won.* And to put it in perspective the largest we've ever won to date is Publix and it's over $200 million.

*Based on the high quality of our sales pipeline and utility infrastructure we expect to finish 2013 very strong and we expect 2014 to be a great year in that business as well.*

46.    The foregoing statements, "This morning we announced a major new utility infrastructure win that has the potential—this is significant. I want to be very clear, this win has the potential to be the largest contract that PowerSecure has ever won. It's one – the contract is with one of the largest electric utilities in the country and they have selected us as one of two new partners to provide transmission, infrastructure service on their power grid"; "But the win of that business is highly significant to us. It's a huge deal for us and something we've been strongly focused on this year"; and "But let me be clear, our work load is doubling. We will be doubling our resources there, we couldn't afford to pull back and then try to ramp up. It was definitely a case where it was best to keep our foot on the accelerator. It cost us some money in the third quarter, it cost us a little in the fourth quarter we got our foot on the pedal. It's a big pay off for us long-term and we really do believe this contract has the potential to be the largest contract we've ever won," were materially false and/or misleading when made because, by

27

November 6, 2013, Defendants did not have any reasonable basis to believe that the announced "win" had the potential to be the largest contract that PowerSecure had ever won or that PowerSecure would be asked to double its work volumes to realize $25-$35 million annually from the relationship. Indeed, on a conference call on May 7, 2014, Defendant Hinton referenced this customer, conceding that they had no basis to represent this relationship would result in substantial work volumes and/or income, candidly stating, "it's a relatively new account and we just guessed wrong." Thus, PowerSecure was "guessing" when it made this statement, which should have been disclosed to investors, and, thus, the statements were materially false and/or misleading and made with no reasonable basis.

47. Moreover, Defendants' statements that PowerSecure was already "selected" and was "formally selected" to provide services to the new UI customer were materially false and/or misleading when made, especially when taken with Defendants' other statements, described in the preceding paragraph, that emphasized large volumes of work, indicating to investors that large volumes of work with this new customer were already confirmed when in fact Defendants did not know how much, if any, income PowerSecure could reasonably expect from the relationship. Indeed, on a conference call on May 7, 2014, Defendant Hinton referenced this customer, conceding he and the other Defendants had no basis to represent that this relationship would result in substantial work volumes and/or income, candidly stating, "it's a relatively new account and we just guessed wrong." Thus, PowerSecure was "guessing" when it made this statement, which should have been disclosed to investors, and its statements were materially false and/or misleading and made with no reasonable basis.

48. As a result, Defendants' statements regarding the necessity of keeping PowerSecure's foot on the proverbial "pedal" or "accelerator" by continuing to spend resources in

28

anticipation of "the largest contract [it had] ever won" were false and materially misleading when made because Defendants knew and/or reckless disregarded the facts available to them that they did not have sufficient information with respect to this new contract to make such an assumption. Indeed, on a conference call on May 7, 2014, Defendant Hinton referenced this customer, conceding he and the other Defendants had no basis to represent that this relationship would result in substantial work volumes and/or income, candidly stating, "it's a relatively new account and we just guessed wrong." Thus, PowerSecure was "guessing" when it made this statement, which should have been disclosed to investors, and its statements were materially false and/or misleading and made with no reasonable basis.

49.     The statements misled investors. For example, on November 7, 2013, Lake Street issued a report maintaining a BUY rating for PowerSecure and a $28 price target. (On November 7, PowerSecure shares closed at $17.63.) Lake Street noted "Management discussed a recently expanded agreement – worth an estimated $25-$35 million annually – with one of the largest utility companies in the country. We think these trends continue and push this segment [UI] over $100 million in 2014."

50.     On March 10, 2014, following the release of PowerSecure's fourth quarter and full year 2013 financial results for the period ended December 31, 2013 and its 2014 forecast, the Company conducted a conference call to discuss the results (also attended by Defendants Hinton and Hutter. Among other things, Defendant Hinton stated:

> Turning now to utility infrastructure, which grew right at 82% year-over-year in the fourth quarter and right at 84% for the full-year. Our growth continues to be driven by winning new business from new utility partners and expanding our business with existing partners with an additional contribution from the work we are doing for energy companies.
>
> We saw a very active storm cycle this winter. We enjoy storm works as it gives our best crews an opportunity to serve utilities. Many times we are serving

utilities that we don't have existing work with and to serve the most when they need us the most. It is important to remember that PowerSecure, the greatest value that we get from storm work is not the near term revenues, since we are pulling our crews off existing jobs to do work. Instead it's the marketing value of demonstrating our distinctive capabilities to utilities and our tremendous productivity.

One of the utilities that got familiar with our capabilities as we did storm work for them in past years is the large utility that we announce as a new long term relationship with last quarter. *You'll recall that by holding on to our crews that we have made the decision to hold on our crews in anticipation of winning a large contract, we saw some dilution in our gross margins in the third quarter. And this improved in the fourth quarter as we expected it would, and as we described to you last quarter. We continue to expect that relationship will yield $25 million to $35 million of revenue annually. However, until we have greater visibility with the customer, we will keep the majority of this work out of our backlog, other than near term revenues that we expect to realize.*

*But just to be clear, I want to give everyone a key data point to demonstrate that this relationship is very strong and very active. During the fourth quarter, we recognized $7.5 million of T&D revenue from that customer. With this developing relationship, with our backlog, and with the high quality of sales in our pipeline, we have visibility into what we believe will be another very good year in 2014 for our utility infrastructure business.*

The profitability of this segment is a major corporate priority for us in 2014. We have an outstanding team of leaders there, and they are plowing ground and doing a tremendous job of building our great business, not just in 2013 and back, and not just for 2014, but looking out to 2015 and 2016, a great leadership team.

51.      The foregoing statements, "You'll recall that by holding on to our crews that we have made the decision to hold on our crews in anticipation of winning a large contract, we saw some dilution in our gross margins in the third quarter. And this improved in the fourth quarter as we expected it would, and as we described to you last quarter. We continue to expect that relationship will yield $25 million to $35 million of revenue annually. However, until we have greater visibility with the customer, we will keep the majority of this work out of our backlog, other than near term revenues that we expect to realize. But just to be clear, I want to give everyone a key data point to demonstrate that this relationship is very strong and very active.

During the fourth quarter, we recognized $7.5 million of T&D revenue from that customer," were materially false and/or misleading when made because, by March 10, 2014, Defendants knew and/or reckless disregarded the facts available to them that there was no reasonable basis to expect that the described relationship with the new customer would yield $25 million to $35 million of revenue annually, or to imply that the recognition of $7.5 million of T&D revenue from that customer indicated similar future amounts of business, because Defendants had no idea what amount of business to expect from this new customer. Indeed, on a conference call on May 7, 2014, Defendant Hinton referenced this customer, conceding that they had no basis to represent this relationship as "strong and active" or to imply that the Company's relationship with this customer would lead to profitable business for PowerSecure in 2014, candidly stating, "it's a relatively new account and we just guessed wrong." Thus, PowerSecure was "guessing" when it made this statement, which should have been disclosed to investors, and its statements were materially false and/or misleading and made with no reasonable basis.

52.     Moreover, the statement, "[w]ith this developing relationship, with our backlog, and with the high quality of sales in our pipeline, we have visibility into what we believe will be another very good year in 2014 for our utility infrastructure business" was materially false and/or misleading when made because, by March 10, 2014, Defendants knew and/or reckless disregarded the facts available to them that there was no reasonable basis to represent that they had visibility into the 2014 utility infrastructure business based on the "developing relationship," because Defendants had no idea what amount of business to expect from this new customer. Indeed, on a conference call on May 7, 2014, Defendant Hinton referenced this customer, conceding that they had no basis to represent this relationship as "strong and active" or to imply that the Company's relationship with this customer would lead to profitable business for

PowerSecure in 2014, candidly stating, "it's a relatively new account and we just guessed wrong." Thus, PowerSecure was "guessing" when it made this statement, which should have been disclosed to investors, and its statements were materially false and/or misleading. Moreover, Defendants knew that one of PowerSecure's large UI customers that had previously contracted with the Company to perform high-margin utility infrastructure work at a certain location had failed to renew PowerSecure's contract in that location and had, instead, awarded PowerSecure a new contract in another, distant location, thereby replacing the previous contract with lower-margin work at a new location, that ramping up to service was certain to result in further losses in 2014. Furthering the Company's deteriorating profitability was Defendants' intentional decision to shift away from pursuing DG business to actively seek out larger business opportunities, which sacrificed the smaller, faster-turn projects that had previously provided a steady revenue flow for its core segment, and which inherently resulting in longer sales cycles.

53. On the same call, Defendant Hutter stated that the Company "expect[ed] 2014 gross margins to continue to be in the mid to high 20 percents," that "the revenue backlog [was] a record $248 million . . . compare[d] to $240 million at the time of our last earnings release and $183 million a year ago, so nice increases there," that the "backlog implie[d] continued growth." The foregoing statement was materially false and/or misleading when made because they misrepresented and failed adequately to disclose that the backlog was unsustainable and would need to be revised downward, and did not actually imply continued growth because Defendants did not disclose that:

a. One of PowerSecure's large UI customers that had previously contracted with the Company to perform high-margin utility infrastructure work at a certain location had failed to renew its contract with PowerSecure in that location and, instead, had awarded

32

PowerSecure a new contract in another location, thereby replacing the contract with lower-margin work at a more distant location.

b. Further, as a result of the reallocation, the Company would lose the capital spent hiring and training the crews in the original location and the personnel would leave PowerSecure to work for a competitor.

c. As a result of the reallocation, the Company was required to hire and train new crews in the new location in order to service the contract.

d. PowerSecure was retaining certain of its trained crews in anticipation of being selected for a potential UI opportunity with a new customer, the scope of which Defendants were "guessing" was significantly larger than it was, incurring significant expenses without any reasonable expectation of return on the investment.

e. PowerSecure's statement that it was experiencing unspecified inefficiencies was insufficient to describe the material impact that these inefficiencies were having on the Company's financial health. Moreover, the statement was negated by Defendant Hinton's comments that it expected large volumes of work from a newly-announced customer, minimizing the effect, as described below.

f. As a result of the Company's shift in strategy regarding its DG business, to actively seek out larger business opportunities while neglecting its smaller projects that turn over faster and had previously provided a steady revenue flow for its core segment, it was experiencing longer sales cycles.

54. The price of PowerSecure stock spiked on this news, on unusually large volume of more than 1.4 million shares, reaching a Class Period high of $27.44 per share in intraday trading and closing at $25.28 per share on March 11, 2014 – a one-day increase of more than

9.4% from the $23.10 per share closing price on March 10. The same day, the NYSE Composite fell about 0.58%.

55.    Guided by Defendants' statements concerning the Company's 2013 results and 2014 prospects, on March 11, 2014, analysts with Lake Street, Craig-Hallum, and Maxim, which had underwritten the August 2013 Company Offering, all published highly positive reports. Both Craig-Hallum and Maxim significantly increased their stock ratings and price targets for PowerSecure. Concluding the Company "is still at early stages of a multiyear revenue and EPS ramp," Craig-Hallum reiterated its Buy rating and raised its price target to $31, "which we believe could well be exceeded in the near-term." Regarding the Company's expanded contract with one of its large electric utility customers, Craig-Hallum stated: "As a reminder POWR has been formally selected to provide transmission services for a major utility over a two-year period ($25M-$35M annually) . . . ." Craig-Hallum estimated first quarter 2014 earnings per share of $0.02 on revenues of $57.6 million and full year 2014 earnings per share of $0.77 on revenues of $321.6 million.

56.    Maxim upgraded PowerSecure stock to Buy (from Hold) and established a $30 per share price target, taking note that "[o]n the conference call, management voiced confidence in the bidding opportunities across all segments" and that "management is targeting transformational larger-scale projects in DG within the end markets of data centers and hospitals." Regarding the expanded UI contract, Maxim recounted: "At this time POWR, still believes an incremental $12-$15M may be possible on new work. POWR estimates this contract may provide annual revenue of $20-$30M per year." Maxim estimated earnings per share of $0.03 for the first quarter 2014 and $0.74 for the full year 2014.

57.     Lake Street emphasized that "[m]omentum continues for Power Secure as revenue increased 42% organically in the quarter, helped by an 81% increase in the Utility Infrastructure segment, which benefitted from the ramp of a large new utility customer."   Reflecting Defendants' bullish statements, Lake Street was highly positive about the Company's prospects:

- We expect shares to continue to move higher as the Q4 results increase our confidence that PowerSecure can exceed its goals of $300M+ million in revenue and should meet its goal of implied EPS $1.10-$1.30 in 2015.

- We think the company's strong growth trends remain intact and are increasing our estimates to reflect this.  We now estimate the company will achieve $358 million in revenue.

- **On-Track To Reach Performance Goals** – We believe PowerSecure is on-track to reach over $300 million in revenue this year, above its previously stated goal.

- **Utility Infrastructure Very Strong** – UI segment revenue of $37.5 million (+82%) was above our $26.9 million estimate due to larger than expected amount of work with a single customer.  Management attributed its success to its ability to both gather new customers and expand on existing relationships with its existing energy customers.  We think these trends continue and push this segment over $130 million in 2014.

Lake Street estimated first quarter 2014 earnings per share of $0.01 on revenues of $56.7 million and full year 2014 earnings per share of $0.66 on revenues of $302 million.  It reiterated its BUY rating and $28 price target for PowerSecure shares.

58.     On April 17, 2014, Roth issued a report reiterating its Buy rating and $30 price target for PowerSecure.  Roth estimated first quarter 2014 earnings per share of $0.02 on revenues of $58.9 million and full year 2014 earnings per share of $0.69 on revenues of $316.2 million.

59.     On or about April 30, 2014, PowerSecure disseminated to its shareholders its 2013 Annual Report, which contained a signed letter from Defendant Hinton to PowerSecure shareholders, dated April 2014.  Among other things, Hinton's letter stated:

35

> It was a dynamic year for our utility infrastructure (UI) products and services, with year-over-year revenue growth of 84 percent. ***Our growth continues to be driven by new business awards from new utility partners and by expanding our business with existing partners. With our expanding utility relationships, strong backlog, and the high quality of our sales pipeline, we have visibility into what we believe will be another very good year in 2014 for our utility infrastructure business.***

The 2013 10-K, which was materially false and misleading for the reasons set forth above, was included as part of the 2013 Annual Report.

60.     Defendant Hinton's positive statements concerning PowerSecure's performance and prospects in his letter to shareholders, including his statement that "we have visibility into what we believe will be another very good year in 2014 for our utility infrastructure business," were materially false and misleading when made, and lacked a reasonable basis, because Defendant Hinton misrepresented and failed to disclose adequately that:

a.     PowerSecure's UI business was plagued by serious and financially draining operational inefficiencies that that were having a material adverse impact on gross margins and earnings, as detailed herein, including inefficiencies related to (i) Defendants' strategy of shifting resources from less profitable to more profitable UI assignments and (ii) the loss of a major UI contact from an existing customer that was replaced with a new agreement from that customer in a different territory, requiring it to invest in a new infrastructure and new crews in the new work area; and

b.     As a result of the Company's shift in strategy in its DG business to focus on larger business opportunities rather than smaller projects that turn over faster and previously had provided a steady revenue flow, its DG business was experiencing longer sales cycles, which was having a material adverse impact on profitability.

## DEFENDANTS FAILED TO DISCLOSE KNOWN TRENDS IN VIOLATION OF SEC REGULATIONS

61.     In addition to the foregoing, in the Company's SEC filings on Forms 10-K and 10-Q during the Class Period, including the second quarter 2013 10-Q, the third quarter 2013 10-Q, and the 2013 10-K, all referred to above, Defendants violated Item 303 of SEC Regulation S-K, 17 C.F.R. §229.303, which required the MD&A section in each annual and quarterly filing to describe "known trends or uncertainties that have had or that" the Company "reasonably expects will have a material . . . unfavorable impact on net sales or revenues or income from continuing operations." Item 303 of Regulation S-K, 17 C.F.R. § 229.303(a)(3)(ii); Exchange Act Release No. 34-26831 ("Interpretative Release"), 43 SEC Docket 1577 (May 18, 1989) ("Required disclosure is based on currently known trends, events, and uncertainties that are reasonably expected to have material effects.").

62.     The instructions to Item 303(a) state:

> The discussion and analysis shall focus specifically on material events and uncertainties known to management that would cause reported financial information not to be necessarily indicative of future operating results or of future financial condition. This would include descriptions and amounts of (A) matters that would have an impact on future operations and have not had an impact in the past, and (B) matters that have had an impact on reported operations and are not expected to have an impact upon future operations.

63.     In violation of Item 303 of Regulation S-K (17 C.F.R. 229.303), Defendants failed to disclose the existence of known trends and uncertainties they reasonably expected would have a material unfavorable impact on PowerSecure's operating results, which they eventually did. Among other things, Defendants failed to disclose adequately:

- PowerSecure failed to receive renewal of at least one contract with an existing UI customer and was instead awarded a new contract by that customer in a new, distant location which required PowerSecure to built a new servicing infrastructure from scratch in the new location. Despite knowing this risk, PowerSecure failed to disclose this known uncertainty to the investing public and

37

instead invested heavily in crews and equipment in one particular location, knowing that the investment would not be transferrable to another location, and that, if the work did not materialize, or was reallocated to a different service provider (as occurred at the end of the second quarter of 2013), the crews it trained would go to work for PowerSecure's competitor in that location, and would not relocate to the new work site and the result would be a materially adverse impact on PowerSecure's revenues, earnings and operations.

- In addition, if the customer did not renew the contract and the work for that customer was relocated, a known risk, Defendants knew PowerSecure would be required to undertake the expense of hiring and training new crews to complete the work that was reallocated to the new location in order to service the contract and that endeavor would have a materially adverse impact on PowerSecure's revenues, earnings and operations.

- The Company was retaining certain of its trained crews and equipment in anticipation of being selected for a potential UI opportunity with a new customer, the scope of which Defendants knew they were "guessing" was significantly larger than it was, incurring significant expenses without any reasonable expectation of return on their investment, and Defendants knew that, if PowerSecure was not hired to perform its services in that location, it would have a materially adverse impact on PowerSecure's revenues, earnings and operations.

- The Company had been experiencing much longer sales cycles in its DG segment as it sought to close larger opportunities, failing to bring in the faster-turn, smaller projects that had previously provided a steady revenue flow for that core segment, and Defendants knew, coupled with the risks inherent in PowerSecure's contracts with its larger customers that the loss of a larger contract, failure to obtain new large contracts, or a change in venue of a large contract, would have a materially adverse impact on PowerSecure's revenue, earnings and operations.

- As a result of the foregoing undisclosed issues, during the Class Period, PowerSecure experienced under-utilization of its labor and other inefficiencies in its UI segment, significantly increased operational costs, decreased operating margins, and decreased profits, which represented a known trend that, if it continued, would have a material adverse impact on PowerSecure's revenues, earnings and operations.

The undisclosed trends and uncertainties ultimately caused the Company to report declining revenues and substantial net losses by the first quarter 2014.

64.     Defendants reasonably expected that such known trends and uncertainties in their business would have a material unfavorable impact on the Company's operating results, as they

38

eventually did. Because the impact of these undisclosed facts was highly material to the Company's performance and prospects, and the Company had a duty to disclose these material facts by virtue of Item 303, the failures to disclose these facts in the Company's periodic filings with the SEC during the Class Period constitute material omissions for the purposes of an action under Section 10(b) of the Exchange Act and Rule 10b-5.

65.     Defendants were acutely aware of their duties. On September 16, 2013, the SEC sent a letter to Defendant Hinton, as President and CEO of PowerSecure, concerning, among other things, the Management's Discussion and Analysis (MD&A) of Cash Flows contained in the Form 10-K for the year ended December 31, 2012. The SEC advised: "Please revise your narrative analysis of cash flows to analyze the underlying reasons for changes in your cash flows and to better explain the variability in your cash flows, rather than merely reciting the information seen on the face of your cash flow statement. Refer to Section IV of our Release 33-8350."

66.     The Release to which the SEC referred Defendants provides ample guidance regarding Item 303:

> The purpose of MD&A is not complicated. It is to provide readers information "necessary to an understanding of [a company's] financial condition, changes in financial condition and results of operations." The MD&A requirements are intended to satisfy three principal objectives:
>
> - to provide a narrative explanation of a company's financial statements that enables investors to see the company through the eyes of management;
> - to enhance the overall financial disclosure and provide the context within which financial information should be analyzed; and
> - to provide information about the quality of, and potential variability of, a company's earnings and cash flow, so that investors can ascertain the likelihood that past performance is indicative of future performance.
>
> MD&A should be a discussion and analysis of a company's business as seen through the eyes of those who manage that business. Management has a unique perspective on its business that only it can present. As such, MD&A should not be a recitation of financial statements in narrative form or an otherwise

39

uninformative series of technical responses to MD&A requirements, neither of which provides this important management perspective. Through this release we encourage each company and its management to take a fresh look at MD&A with a view to enhancing its quality. We also encourage early top-level involvement by a company's management in identifying the key disclosure themes and items that should be included in a company's MD&A.

SEC Release No. 33-8350, 17 C.F.R. § 211, 231, 241, at I.B. (Interpretation: Commission

Guidance Regarding Management's Discussion and Analysis of Financial Condition and Results

of Operations) (footnotes omitted).

67.     Thus, under Item 303, PowerSecure had an affirmative duty to disclose known

trends or uncertainties that, if they came to fruition, would have a material adverse impact on the

Company's operations, or financial results.  Moreover, Item 303 imposed duty to disclose known

trends or uncertainties that, if they came to fruition, would result in prior results not being

indicative of future results.  The information known to Defendants was material.  Thus, as a

result of Defendants' possession of  material information known to them that, if the then known

trends or uncertainties came to fruition based on that material information, would adversely

impact PowerSecure's operations and financial results and render those results materially

different than the Company's prior financial results, PowerSecure violated a duty to disclose and,

because the information not disclosed was material, PowerSecure made material omissions

actionable under the federal securities laws.

**THE TRUTH IS REVEALED**

76.     After the close of trading, on May 7, 2014, the last day of the Class Period,

PowerSecure issued a press release announcing disappointing financial results for the first

quarter 2014.  Surprising the market, the Company reported a ***net loss*** of almost $4.3 million, or

$0.19 a share, on revenues of $52.8 million – far from the ***net profit*** of $733,000, or $0.04 a

share, for first quarter 2013.  Gross margins had narrowed to 20.9% from 30.6% as cost of sales

40

jumped 34% to $41.8 million. Operating expenses had also climbed 39% to $17.7 million. Revenue from distributed generation (DG) products and services declined 17%.

77.     Based on Defendants' positive assurances during the Class Period, analysts had expected a net profit for the quarter, and for the full year. Thus, less than two months earlier, on March 11, 2014, for the first quarter 2014, Lake Street had estimated earnings per share of $0.01 on revenues of $56.7 million; Maxim had estimated earnings per share of $0.03 on revenues of $60.6 million; and Craig-Hallum had estimated earnings per share of $0.02 on revenues of $57.6 million. Likewise, on April 17, 2014, Roth had estimated first quarter 2014 earnings per share of $0.02 on revenues of $58.9 million.

78.     Commenting on the dismal performance in the release, Defendant Hinton stated, in pertinent part, that Defendants "were very disappointed with first quarter revenues and the degree to which [PowerSecure's] utility infrastructure revenue shortfalls and operating inefficiencies negatively impacted gross margins and [its] bottom line." The release also quoted Hinton stating that the Company had "mis-timed actions to shift resources to more profitable customers, as revenues from those new customers were not adequate to sustain [its] margins." Concerning the reduction in PowerSecure's gross profit margins, the release stated in pertinent part as follows:

> This year-over-year gross margin decrease was driven primarily by inefficiencies in our utility services group as we took actions to shift resources, including equipment and people, away from certain lower-profit assignments. Our intent was to deploy these resources towards customer opportunities to increase our long-term profitability. However, we were not successful in redeploying all of the assets to new assignments in a timely manner as a result of lower-than-expected revenues from certain customers. These productivity losses caused us to incur higher levels of personnel and equipment costs in our cost of goods sold as a percentage of our revenues, driving the gross margin on our utility services revenue to 5.9 percent for 1Q 2014, and our overall utility infrastructure revenue gross margin to 9.9 percent. This compares to 25.6 percent in 1Q 2013 and an

41

average quarterly gross margin of 19.5 percent for utility infrastructure revenues in full year 2013.

79.     The release also quoted Defendant Hinton stating that PowerSecure had "reduced [its] revenue and profit expectations for 2014," stating PowerSecure then expected a second quarter 2014 net loss of between $0.15 and $0.09 a share on $55 million to $60 million in revenues, versus the profits of $0.15 on $77.6 million in revenues that Defendant's bullish statements had led the market to expect during the Class Period. The Company's forecast for the third and fourth quarters 2014 also missed what Defendants had led the market to expect. The release further emphasized that the Company had "near-term work to do to improve [its] utility infrastructure margins and increase the conversion of [its] distributed generation pipeline into backlog," and that "improvements in [it] UI business" may not be seen until "2015 and beyond."

80.     Later on May 7, 2014, the Company conducted a conference call to discuss the financial results for the first quarter 2014 and reduced 2014 guidance.  Defendants Hinton and Hutter participated in the call.   Defendant Hinton again stated that PowerSecure's utility infrastructure division had a revenue shortfall and operating inefficiencies that "negatively impacted the gross margins and [its] bottom line" because the Company "mis-timed the shift in resources from less profitable customers to more profitable customers, as revenues from the new customers . . . did not materialize fast enough to sustain the margins that [PowerSecure was] hoping to achieve." Defendants finally disclosed the trends PowerSecure had been experiencing throughout the Class Period.  Significantly, Defendants Hinton and Hutter admitted, in pertinent part, as follows:

> [Hinton:] As we move[d] through 2013, we and you as well as investors, you can see that the pace  of the growth was accelerating, but we also saw that the gross margins - the utilization was a significant issue. And we made a conscious decision late in the year to try to slow that growth down and fix these gross margins. Again, we miss timed that which resulted in these first quarter results.

42

The rapid growth that we had introduced some inefficiencies, some new inefficiencies into the business. Again, remember the situation in the third quarter when we held onto crews associated with a large award that we had won and gross margins dipped around 7%, if I recall, for that particular division. In the fourth quarter, those same customers, those crews were in position and able to do new work. That was $7.5 million of work with that customer.

And accordingly, we had higher utilization rates and higher gross margins across utility services. As you will hear later in the call, the revenues from that customer did not materialize in the first quarter as we had anticipated.

With the benefit of hindsight, as we talked earlier, we want to slow down the growth of it, fix the operating efficiencies in the business, make sure we had the measures in place. With the benefit of hindsight, we probably should have pulled that labor one or two quarters earlier.

We made the decisions to slow down and pull crews out of one particular customer and reposition them. Where we repositioned them, the work did not materialize unfortunately. To a large extent that's associated with an opportunity with a new customer and we just weren't familiar with the rhythm at which they assign work. We thought we were because we have been in the cycle. We now have a better feel for that . . .

*     *     *

[Hutter:] While we saw revenue growth of 17% in the first quarter because of the inefficiencies in our utility services and a protracted sales cycle times of our larger DG projects, this level of revenues did not provide enough scale to support our margins in the quarter. Our two largest business areas DG and utility infrastructure are lumpy businesses and in the first quarter we just did not have an enough DG revenue to make up for the inefficiencies in our utility infrastructure business, which led to what are obviously very disappointing results for us.

*     *     *

We saw utility infrastructure growth of 35.2% which reflects our efforts again to slow our growth, that's a lesser pace than we recently had to slow our growth and focus on profitability within utility services, and our DG revenues declined 16.5% year-over-year as our team has been focused on pursuing larger projects, which are a bit lumpier . . .

*     *     *

This year-over-year gross margin decrease was primarily driven by the inefficiencies we've described in utility services as we took actions to shift resources, including equipment and people away from certain lower profit assignments. Our intent was to deploy these resources towards customer opportunities to increase our long-term profitability. However, we were not

43

successful in redeploying all of the assets, the new assignments in a timely manner as a result of lower than expected revenues from certain customers.

These productivity losses caused us to incur higher levels of personnel and equipment cost in our cost of goods sold as a percentage of our revenues, driving the gross margin on our utility services revenue to 5.9% in the first quarter of 2014, and our overall utility infrastructure revenue gross margin to 9.9%. That includes the consulting pieces of that. This compares to 25.6% for the entire utility infrastructure revenue grew in the first quarter 2013, and an average quarterly gross margin of 19.5% for utility infrastructure for the full year 2013. So you can see, it really was just a dramatic drop-off there.

In the past few weeks, we've been digging in, looking very specifically at both our fleet and crude utilization rates, both of which jumped to uncomfortable levels in the first quarter and highlight the inefficiencies that we have to correct. In the first quarter, our fleet expense cost - just to give you a couple of data points, our fleet expense cost increased 10 points as a percentage of revenue compared to recent run rates. We saw similar levels of inefficiency with our crude utilization as our direct labor cost as a percentage of revenues declined seven percentage points compared to recent run rates. These are obviously very substantial increases especially in a business that generated $112 million of revenues last year. Just in terms of - the scale of our operations now is obviously much bigger than it has been in the past.

81.     Defendants also engaged in the following colloquy with an analyst from Roth Capital concerning the margin problems sparked by the large utilities customer that they started working with at the end of the second quarter 2013:

**Philip Shen - Roth Capital**

. . . . your margins have been pretty good throughout 2013 and then where the margins from that one like today utility customers specifically or group of utility customers start to put the screws to you guys, or did they overnight just say you know what we're paying you 30% less. I mean what - how did that happen?

**Sidney Hinton**

I'll be honest. I'll give you the specific colors – public call, right? Anything I say is on record? Yeah. No, yeah I'm sorry, I was looking at my frantically panicked CFO and head of Investor Relations. *The fact of the damn situation is we have a big client and we want another big contract from them. But they changed the geographies we were serving and our people lived in a different part of the state. It'd be like having a contract in California, that serve in San Francisco and you win a damn contract in Los Angeles. So people aren't going to drive to work down there every day.* We actually get paid more for the other territory. But it's a

44

question of effectiveness. It is a more dense area; you get paid on units. Can you get enough units done? Whether you got new people and if you saw results internally, you could see it. I mean, that shift occurred at the end of the second quarter. We knew we were ramping in the third quarter. So we weren't that concerned. We know that you face that every time you step up. We faced it again in the fourth quarter, which again we expected, but we really come to question - shit - I'm sorry, excuse me. Hey, what are the gross margins? What's the potential here? What are we measuring ourselves against? Are we beating our head against a wall, or we doing something that we just need to learn a better practice for, or is this just a finite opportunity that's there because of the urban nature of the work? But that's exactly the biggest driver.

*The other was that we had a customer, a key that - I think we said it specifically, that $7.5 million of work in the fourth quarter that we then got $1 million of work in the first one. They're a great customer. We expect to get a bunch order from them over the remaining months of this year and over the coming years. We love them. They're a great account. No issue with them at all. We adjust, we try to guess the rhythm of how work is released and it's a relatively new account and we just guessed wrong.*

### Philip Shen - Roth Capital

Okay. That's really helpful. So let me just paraphrase what I understand. So for that large client, you guys have been serving them and helping them out for a while. You guys want a new territory but your crews and your trucks weren't necessarily staffed for that territory, is that correct?

### Sidney Hinton

That's correct.

### Philip Shen – Roth Capital

And so then it's a question of do we – do you continue to service that territory but with an outsourced group of –?

### Sidney Hinton

No. We basically we hired people and built up from scratch in that area to serve it. From the utilities perspective, they gave us the same amount of work. They just changed the geography. So it's not a negative from their perspective. And operationally, candidly, we probably underestimated the negativity of it that just the complexity of basically starting from scratch in a new territory. But yes, you're right. Your summary is right.

### Philip Shen - Roth Capital

So did they take away the existing territory and the[n] give you a whole new

45

territory of equal value?

**Sidney Hinton**

They did. And pay for it actually looks better. But I would say that's an Excel Spreadsheet that looks better. It's done better on our income statement. And either we're not doing our units good and believe me our people working on night and day around the clock to optimize that, or it might be hell of a lot of work there, but the environment maybe just too difficult for us to be profitable.

**Philip Shen - Roth Capital**

Now have you gone back to the utility to just try and get the original territory back. Is that a possibility and also...?

**Sidney Hinton**

Unfortunately they assign these territories for several years at a time and they make strategic decisions around that. And truthfully and unfortunately, your workforce kind of lives in those territories, so they just changed the company they work for. The utilities doesn't really get hit with it as bad. And I would say, somebody who's probably going to benefit of our damn good crews that we trained and we're dealing with the consequences of somebody else's piss-poor training and management that we're now trying to build something out of.

**Philip Shen - Roth Capital**

Okay. So you actually you lost a lot of crews as well that were in that good -- that original territory.

**Sidney Hinton**

They literally live way away. I mean, they weren't going to commute to work. They had been able to – they didn't have a per diem for overnight because they lived at home, and they weren't interested in being migratory. And some – a lot of our crews are, so it's not –.

**Philip Shen - Roth Capital**

So it's on magnitude basis, if last year's revenues were $112 million, $100 million-plus in revs for utility, what's the size of this client. . .?

**Sidney Hinton**

10%.

**Philip Shen - Roth Capital**

10%? Okay. All right.

**Sidney Hinton**

Roughly, yes.

**Philip Shen - Roth Capital**

All right. Now, was there any - were there any other issues at all. I mean is this the main one are there...?

**Sidney Hinton**

. . .is that issue? This is very, very simple. Is that issue and the fact that when we step, there's actually more work in this territory. So we bought the trucks and staffed for it. But if you're getting paid, just because somebody is selling. We could sell a gazillion more units but if we're selling for $1 and it costs us $1.10 ain't a good thing . . .

**Philip Shen – Roth Capital**

Let's just put it out from...

**Sidney Hinton**

. . . we still had - we slowed down because we questioned, can we really make money on these units? We slowed down to do it with our best people and see but we still had the fleet and we were hoping to redeploy the fleet elsewhere with a nice opportunity that we want it verbally, but not put in a backlog, or really I don't think we've announced it.

**Chris Hutter**

Yeah. It was in backlog.

**Sidney Hinton**

I'm not talking about – I'm talking about the –

**Chris Hutter**

No, we haven't.

**[Sidney Hinton]**

Yes. Yeah . . . Okay, I'm sorry. That's the downside of a live call. But anyway we couldn't move the fleet. So we stuck with the fleet, not utilized in the fleet, and

47

the people we are utilizing, we're probably losing a nickel per every dollar. And that's one thing and then at the same time not having the work we had anticipated from the . . .

82. Defendant Hinton also attempted to explain that the timeline for conversion for larger distributed generation projects was "longer than what [Defendants] had experienced" as the Company was "more accustomed to chasing, winning and forecasting" smaller projects.

83. On May 8, analysts at Baird, Roth, Lake Street, Maxim, and Craig-Hallum – the underwriters for the August 2013 Company Offering – all immediately slashed their ratings and price targets for PowerSecure stock:

- In a report entitled "Too Big Of A Bite Causing Bad Indigestion," Lake Street noted: "The company encountered operational issues and inefficiencies as it adjusted to a large customer program, which significantly impacted Q1 results and the 2014 outlook." Lake Street further noted: *"We were surprised and disappointed by the weak Q1 results and lower outlook. Q1 revenue of $52.8 million (+17.4%) was below our $56.7 million estimate due to elongated sales cycles in the DG segment. Adjusted-EPS of ($0.17) was well below our $0.01 estimate due to under-utilized labor and other inefficiencies in the UI segment."* Lake Street lowered its rating to HOLD and reduced its price target to $12 per share;

- Maxim downgraded PowerSecure to Hold from Buy, removed its prior $30 price target, and recommended "that investors move to the sidelines following first-quarter results." *"We were blindsided by 1Q14's results, particularly given the cadence, backlog, and outlook provided following 4Q13 results back in March of this year."* "Revenues came in at $52.8 million, up 17.4% y/y *but below our estimate of $60.6M and the consensus of $59.3M.*" *"Non-GAAP EPS from continuing operations came in at ($0.19), well below our estimate of $0.03 and the consensus of $0.02."* Maxim explained that the Company's gross margin was lower "due to the inefficiencies in the utility-services segment."

- Roth downgraded its rating to Neutral from Buy and its price target to $10 from $30, explaining: "POWR posted light Q1 revenues of $52.8mn vs. consensus of $59.3mn and ROTHe of $58.9mn, driven by low utilization in UI and a longer sales cycle for larger DG projects. This resulted in much lower-than-expected GMs of 21.5% vs. consensus of 27.8% and ROTHe of 28.4%. Continuing EPS was -17c vs. consensus of 2c and ROTHe of 2c." Among other things, Roth took note that "[a]fter growing its DG and UI businesses at 30% and 66% CAGRs, respectively, over the past three years, management was perhaps too focused on

48

growth and did not necessarily have the best systems in place to monitor its core business."

- Craig-Hallum lowered its rating to Hold and its price target to $13. It explained: "1Q results were below expectations and operational inefficiencies in Utility Infrastructure (UI) and to a lesser extent in Distributed Generation (DG) have caused *an abrupt departure from POWR's previous outlook and the positive trends across all of its segments.*" "*The major surprise along with results was the weak guidance provided – an abrupt change from its previous outlook and positive trends within its segments, in particular Utility Infrastructure (UI).*"

- Baird analyst Ben Kallo slashed his price target on PowerSecure to $17.00 (from $29.00), commenting: "*POWR missed estimates across the board and issued lower-than-expected 2014 guidance* due to several factors."

84.     In reaction, immediately following these shocking adverse revelations, the Company's common stock plunged more than 62% from the $18.60 closing price on May 8, 2014 (and more than 72% from the Class Period high of $25.28 on March 11, 2014) to close at just $7.00 on May 8, on extraordinary trading volume of over 10 million shares. The same day, the NYSE Composite fell just 0.15%. Since May 8, 2014, PowerSecure shares have not traded above the prices Class members paid during the Class Period. As a result, members of the Class who purchased PowerSecure securities during the Class Period and continued to hold those securities until they declined in value upon Defendants' revelations on May 7, 2014 have sustained economic injury.

## POST-CLASS PERIOD DEVELOPMENTS

85.     Evidencing the seriousness of PowerSecure's problems, after the Class Period, the Company has continued to show declining revenues and to report substantial net losses. Thus, for the second quarter 2014, ended June 30, 2014, the Company reported revenues of $57.069 million and a *net loss* of $2.748 million as compared to revenues of $70.187 million and *net income* of $2.042 million for the second quarter 2013. For the third quarter 2014, ended September 30, 2014, the Company reported revenues of $65.044 million and a *net loss* of $0.536

49

million as compared to revenues of $81.510 million and *net income* of $3.473 million for the third quarter 2013.

## SCIENTER ALLEGATIONS

86.     Defendants acted with scienter in that each Defendant knew, or recklessly disregarded, facts available to them that demonstrated the public documents and statements issued or disseminated in the name of the Company and complained of herein were materially false and misleading; knew, or recklessly disregarded, that such documents and statements would be issued or disseminated to the investing public; and knowingly, or recklessly, issued or disseminated or substantially participated or acquiesced in the issuance or dissemination of such documents and statements as primary violators of the federal securities laws.   Defendants participated in the fraudulent scheme alleged by virtue of their receipt of information reflecting the true facts regarding PowerSecure, their control over the Company's materially false and misleading statements, and their positions of control within the Company, all of which made them privy to confidential, proprietary information concerning PowerSecure, and its business, performance, and prospects.

87.     The Individual Defendants were the most senior executive officers at the Company – its CEO/President and CFO – and were responsible for overseeing its business and operations day-to-day.   The matters here at issue, including the serious difficulties at the Company's two most important business segments, UI and DG, accounting for a substantial majority of all the Company's revenues, were at the core of the Company's business and were critical to its overall performance and prospects.   During the Class Period, Defendants made numerous public statements concerning the matters at issue.

88.     In a September 30, 2013 letter to the SEC, signed by Defendant Hutter, the
Company described the central importance of CEO Hinton to the everyday management of the
business:

- *Our chief operating decision maker is our Chief Executive Officer, or CEO. Our CEO makes all final decisions with respect to the allocation of resources and assessment of performance in our company.*

- Our Chief Executive Officer operates a matrix organization, *with numerous direct reports including multiple sales leaders, product leaders, operations leaders and functional leaders*. We do not operate the business with an operating committee or through divisional business heads.

- *Our structure and operations have been the result of our CEO being the founder of our Utility and Energy Technologies Segment and operating the day-to-day business in direct contact with individual sales leaders, product and service leaders, operations leaders and function leaders. Our CEO makes his resource allocation decisions based upon his daily interaction with his direct reports and his knowledge of the Utility and Energy Technologies industry and market opportunities.*

89.     In a November 5, 2013 letter to the SEC, also signed by Defendant Hutter, the
Company elaborated that, as President, CEO, and "our Chief Operating Decision Maker,"
Defendant Hinton was "regularly provided" with information concerning the Company's
business and performance, including monthly financial statements; monthly "financial results
detail," which Hinton "review[ed] . . . with our finance and accounting team on a quarterly
basis"; "sales information," which Hinton reviewed during quarterly business reviews he
conducted "in meetings that include[d] our sales leaders, product/service leaders, and finance and
accounting leaders"; "planning/forecasting information"; and "financial review material," which
was reviewed at Board of Directors meetings in discussions led by Hinton and Hutter.

90.     The Company's letter to the SEC also reiterated:

Mr. Hinton operates and manages a matrix organization with numerous direct
reports including multiple sales leaders, product leaders, operations leaders, and

51

functional leaders. ***He operates and manages our business through information he receives from direct interactions with these direct reports, and does not operate or manage our business through an operating committee or divisional heads.***

91.     Former PowerSecure employees (confidential witnesses) provide facts that further support a strong inference that Defendants knew or recklessly disregarded, the serious problems affecting the Company's performance during the Class Period.

92.     CW1 was a PowerSecure Vice-President of Engineering/Project Management in the UI group, from May 2010 through late 2011, and then a Senior Vice President of Sales in the UI group, from late 2011 through January 2014. Thus, CW1 was in a position at the Company to have personal knowledge and information concerning the matters set forth herein. CW1 confirmed that problems affecting the Company's UI business significantly pre-dated the May 2014 disclosures, as far back as the beginning of the Class Period.

93.     CW1 believes that the customer Defendants discussed in May 2014 that had shifted the location of the area to be served by PowerSecure was Florida Power & Light Company ("FPL").[2] Specifically, PowerSecure did distribution work, supplying crews and equipment to FPL to conduct pole hardening, pole changeouts, and re-conductor jobs. CW1 explained that, in May 2013, PowerSecure had to shut the two or three offices it had been operating in the area of West Palm Beach, Florida. When PowerSecure re-bid the FPL contract, it lost the service territories near West Palm Beach and gained new territories in the area of Ft. Meyers, Florida, approximately 125 miles away, across the state. According to CW1, all the personnel the Company had in the West Palm Beach area, with no work to perform there for the

---

[2] During the Class Period, as demonstrated above, Defendants were careful not identify, by name, the customers they referred to in their public statements.

52

Company, jumped ship and went to another contractor, and the Company had to start over. CW1 further related that setting everything up again required a significant investment.

94. CW1 also stated that the UI group stopped growing in the third and fourth quarters of 2013 as a result of the falloff of some of PowerSecure's large projects. CW1 related that PowerSecure spent an estimated millions of dollars preparing to do transmission work for Dallas-based Oncor, one of its largest customers, in late summer 2013, and then the work failed to materialize.

95. On May 7, 2014, the end of the Class Period, Defendants revealed that the Company's difficulties were the result of *deliberate strategies* they had undertaken during the Class Period. Thus, Defendants made clear that the gross margin decrease "was driven primarily by inefficiencies in our utility services group *as we took actions* to shift resources, including equipment and people away from certain lower-profit assignments"; that "we mis-timed actions to shift resources to more profitable customers, as revenues from those new customers were not adequate to sustain our margins"; and that, in the Company's DG business, Defendants had shifted focus from smaller projects they were able to turn over faster to pursue larger opportunities with a longer timeline. Reflecting the seriousness of the operational issues and Defendants' awareness thereof, on May 7, Defendant Hinton admitted that "[a]s we move[d] through 2013 . . . *we also saw that the gross margins – the utilization was a significant issue*," and that Defendants had "made *a conscious decision* late in [2013] to try to slow that growth down" in the UI business to address the issues.

96. In addition, on May 7, Defendants revealed that their representations concerning the amount of new business from a major customer, which had accounted for roughly 10% of 2013 utility revenues, were based on just "*guesses*"; and that, with respect to the operational

53

inefficiencies in the UI business, Defendants "probably underestimated the negativity of it, just the complexity of basically starting from scratch in a new territory."

97.     On the August 7, 2013 conference call, Defendant Hinton explained that the effective management and operation of equipment and personnel were central to the Company's business:

> I would say the limiting factors continue to be – I'd say three things: first, is equipment; second, is training qualified people. And then third is the ability to operate that equipment and manage those people in a safe manner. We owe that to our customers, we owe that to our employees, and that's the reason we made the investment in Powerline, 100% was – we view that as a potential limiting factor and we want to be preemptive in addressing it.

> I would say that we're making headway on the equipment. We believe, we have a – you wouldn't believe – well you would believe, given our past growth, the opportunities are in front of us. And we know that we got to get ahead of it on equipment, and we got to get ahead of it on people, and we're working diligently to do that. But those would be the two biggest issues, to get them, then get them on staff, and get them productive.

98.     Early in the Class Period, the Company sold 2.3 million shares of its common stock to the public at $16 per share, a price that was artificially inflated as a result of Defendants' deceptive statements and omissions, yielding the Company $34.4 million in needed funds. Thus, Defendants had an obvious motive to defraud the market.

99.     In addition, on October 8, 2013, during the Class Period, PowerSecure acquired Encari, LLC, which provides cyber security consulting and compliance services to the utility industry, for $4.8 million in cash, plus potential additional earn-out consideration. The potential additional consideration was an amount of up to an additional $1.2 million, of which half would be payable in shares of PowerSecure common stock, the number of which would be based on their value-weighted average closing price over the 30 business days preceding the closing date.

Accordingly, the higher the average share price, the fewer shares PowerSecure would be required to pay.

100. Defendant Hinton also had personal financial motives. Concurrent with the August 16, 2013 Company Offering, Defendant Hinton sold to the public 200,000 shares of his own personally-held PowerSecure stock – about one third of his total holdings at the time – at the same artificially-inflated price as the Company Offering, earning him $3.2 million in gross proceeds. Further, on December 19, 2013, Hinton transferred 138,770 shares of his PowerSecure common stock – 20% of his holdings at the time – to his spouse, pursuant to a separation agreement, as part of making the final division of marital assets in conjunction with their pending divorce. Based on the artificially-inflated $16.45 closing price that day, the shares had a total value of almost $2.3 million. On February 4, 2014, Hinton transferred another 10,000 shares of his PowerSecure common stock to his spouse, also to fund his divorce settlement. Based on the artificially-inflated $17.96 closing price that day, the shares had a total value of about $180,000. In sum, during the Class Period, Defendant Hinton effectively sold a total of 348,770 shares of PowerSecure common stock, valued at about $5.68 million. The only Company shares Hinton acquired during the Class Period were, as part of his compensation from the Company, grants of restricted shares that he did not pay for out-of-pocket that would only vest over time.

101. Defendant Hinton's stock sales during the Class Period were unusual and suspicious in timing and amount in that, among other things: the sales were very significant both in terms of (i) the numbers of shares sold and transferred and (ii) the dollar proceeds earned from the sales and the value/benefit realized from the transfers; Hinton did not purchase any shares of PowerSecure during the Class Period; he sold significant percentages of his personal holdings of Company stock at the time; and his Class Period trades were manifestly inconsistent with his

55

prior trading pattern. During the more than three and one-half years from January 1, 2010 through the beginning of the Class Period, August 8, 2013, Hinton reported only two sales, more than a year before the Class Period: 7,583 shares on March 28, 2012 at $6.40 per share for proceeds of about $49,000, and another 32,417 shares on the next day, March 29, 2012, at $6.25 per share for proceeds of about $203,000. His total proceeds for those two trades were about $252,000. During the Class Period, Hinton earned more than twelve times that amount just from the sale of his shares to the public. Hinton made no purchases of PowerSecure stock in 2013 or 2014, even though he purchased 10,000 shares in each of the years 2012, 2011, and 2010.

## LOSS CAUSATION/ECONOMIC LOSS

102.    During the Class Period, as detailed herein, Defendants engaged in a scheme and a course of conduct to deceive the market that artificially inflated the trading price of PowerSecure securities and operated as a fraud and deceit on Class Period purchasers of PowerSecure securities by misrepresenting the truth concerning the Company's business, performance, and prospects. Ultimately, however, when Defendants' prior misrepresentations and fraudulent conduct came to be revealed to the market on May 7, 2014, the trading price of PowerSecure securities declined precipitously -- evidence that the prior artificial inflation in the price of those securities was reduced and ultimately eliminated -- and, as a result of their purchases of PowerSecure securities during the Class Period at artificially inflated prices, Plaintiff and other members of the Class suffered economic losses when the true facts about the Company's business, performance, and prospects were revealed and the artificial inflation was removed from price of the Company's securities, *i.e.*, damages under the federal securities laws.

103.    The decline in the price of PowerSecure securities after the true facts came to light was a direct result of the nature and extent of Defendants' fraud finally being revealed to

the market. The timing and magnitude of the decline in the price of PowerSecure securities negates any inference that the loss suffered by Plaintiff and other Class members was caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to Defendants' fraudulent conduct as complained of herein. The economic loss Plaintiff and other Class members suffered was a direct result of Defendants' fraudulent scheme and course of conduct to artificially inflate and maintain the price of PowerSecure securities and the subsequent declines in the market value of those securities when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

104. The economic loss, *i.e.*, damages suffered by Plaintiff and other members of the Class, was a direct result of Defendants' misrepresentations and omissions being revealed to investors, and the subsequent significant decline in the value of the Company's securities on May 8, 2014 was the direct result of Defendants' prior misstatements and omissions being revealed. Artificial inflation in the trading price of PowerSecure common stock caused by Defendants' materially false and misleading statements and omissions is shown by the following chart:



## STATUTORY SAFE HARBOR DOES NOT APPLY

105. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of PowerSecure who knew that those statements were false when made.

106. Each of the Company's annual and quarterly SEC filings on Forms 10-K and 10-Q during the Class Period, which are referred to herein, make substantially the same boilerplate disclosures purporting to describe the risks related to PowerSecure's business. Defendants' purported "risk disclosures," however, did not constitute meaningful cautionary statements but, instead, were materially false and misleading when made because they described only possible risks that might materialize in the future when, in fact, such risks already had begun to materialize and to have a material adverse impact on the Company's performance and prospects. Thus, among other things, Defendants' "risk disclosures" did not reveal that the Company already was plagued by workforce and other inefficiencies in its UI segment, significantly increased operational costs, decreasing operating margins, and decreased profits, as detailed

58

herein. Instead, Defendants' generic disclosures could apply to almost any company selling almost any type of services and were wholly inadequate to apprise investors of the serious problems then facing the Company. Moreover, Defendants' purported risk disclosures were nullified by their positive assurances during the Class Period that PowerSecure's business was strong and growing, as detailed herein.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

107. Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class consisting of all persons who purchased or otherwise acquired PowerSecure common stock or call options or sold PowerSecure put options during the Class Period (the "Class"). Excluded from the Class are Defendants; the officers, directors and employees of the Company at all relevant times; members of their immediate families and their legal representatives, heirs, successors, or assigns; and any entity in which Defendants have or had a controlling interest.

108. The members of the Class are so numerous that joinder of all members is impracticable. As of February 28, 2014, during the Class Period, PowerSecure had more than 21 million shares of common stock outstanding. Throughout the Class Period, PowerSecure shares were actively traded on a United States stock exchange, first on the NASDAQ Global Select Market and then, beginning on August 28, 2013, on the NYSE. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified by records maintained by PowerSecure or its transfer agent and may be notified of the pendency of this action by mail, using the forms of notice customarily used in securities class actions.

109.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class were similarly affected by Defendants' wrongful conduct in violation of the federal securities laws that is complained of herein.

110.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

111.    Common questions of fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)    Whether the federal securities laws were violated by Defendants' acts and omissions as alleged herein;

(b)    Whether Defendants made materially untrue and misleading statements and omissions during the Class Period; and

(c)    Whether the members of the Class have sustained damages and the proper measure of damages.

112.    Plaintiff and other Class members are entitled to a presumption of reliance with respect to their purchases of PowerSecure securities during the Class Period because, among other things:

(a)    The alleged misrepresentations were publicly disseminated;

(b)    The alleged misrepresentations were material;

(c)    PowerSecure shares traded in an efficient market, for the following reasons, among others:

(i)      PowerSecure common stock met the requirements for listing, and was listed and actively traded on the NASDAQ Global Select Market and thereafter on the NYSE, both highly efficient markets for securities;

(ii)    As a regulated issuer, PowerSecure filed periodic public reports with the SEC and with NASDAQ and the NYSE;

(iii)   PowerSecure and its securities were followed by securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace; and

(iv) PowerSecure regularly issued press releases, which were carried by national newswires. Each of these releases was publicly available and entered the public marketplace; and

(d)     Plaintiff and other Class members purchased PowerSecure securities between the time the misrepresentations were made and when the truth was fully revealed.

113.   A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class, individually, to redress the wrongs done to them. There will be no difficulty in the management of this action as a class action. Plaintiff's allegations arise from a series of materially false and misleading statements and omissions Defendants made to the public during the Class Period in SEC filings, Company press releases, and conference calls with analysts. These statements and omissions concealed true, adverse facts about PowerSecure, and its business, performance, and prospects.

61

## CLAIMS FOR RELIEF

## COUNT I

### (For Violations of §10(b) of the Exchange
### Act and Rule 10b-5 Promulgated Thereunder
### Against All Defendants – PowerSecure, Hinton, and Hutter)

114.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

115.    During the Class Period, Defendants carried out a plan, scheme, and course of conduct which was intended to and, throughout the Class Period, did: (a) deceive the investing public regarding PowerSecure's business, operations, performance, and prospects, and the true value of PowerSecure stock; (b) enable Defendants to inflate and to maintain the artificial inflation in the price of PowerSecure stock; and (c) cause Plaintiff and other members of the Class to purchase PowerSecure common stock at artificially inflated prices, resulting in damages after the truth was revealed and the artificial inflation was removed from the price of the stock. In furtherance of their unlawful scheme, plan, and course of conduct, Defendants and each of them, jointly and individually, took the actions set forth herein.

116.    Defendants (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's stock in an effort to maintain an artificially high market price for PowerSecure stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5. Defendants are sued as primary participants in the wrongful and illegal conduct charged herein and as controlling persons as alleged below.

117.    Defendants, individually and in concert, directly and indirectly, by the use of means or instrumentalities of interstate commerce and of the mails, engaged and participated in a

62

continuous course of conduct to conceal and misrepresent adverse material information about the business, performance, and prospects of PowerSecure as specified herein.

118. Defendants employed devices, schemes, and artifices to defraud, while in possession of material adverse non-public information, and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of PowerSecure's value, performance, and prospects, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about Fusion and its business, operations, performance, and prospects in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of PowerSecure stock during the Class Period.

119. Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts. Such Defendants' material misrepresentations and omissions were done knowingly or with reckless disregard for the purpose and effect of concealing the truth regarding PowerSecure's business, operations, performance, and prospects from the investing public and supporting the artificially inflated price of its stock. As demonstrated by Defendants' material misstatements and omissions concerning the Company's business, operations, performance, and prospects throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by recklessly refraining from taking those steps necessary to discover whether those statements were false or misleading.

120. As a result of the dissemination of the materially false and misleading information

and failure to disclose material facts, as set forth above, the market price of PowerSecure stock was artificially inflated during the Class Period. In ignorance of the fact that the market price of PowerSecure stock was artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the stock trades, and/or on the absence of material adverse information that was known to or recklessly disregarded by Defendants but not disclosed in public statements by Defendants during the Class Period, Plaintiff and other members of the Class purchased PowerSecure stock during the Class Period at artificially high prices and were damaged after the truth regarding the Company was revealed, which removed the artificial inflation from PowerSecure's stock price.

121. The Individual Defendants' primary liability arises from the following facts, among others: (a) the Individual Defendants were high-level executives and a director at the Company during the Class Period and members of the Company's management team or had control thereof; (b) by virtue of their responsibilities and activities as senior officers of the Company, the Individual Defendants were privy to and participated in the creation, development, and reporting of the Company's internal budgets, plans, projections and reports; (c) the Individual Defendants enjoyed significant personal contact and familiarity with each other and were advised of and had access to other members of the Company's management team, internal reports, and other data and information about the Company's business, operations, performance, and prospects at all relevant times; and (d) the Individual Defendants were aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

122. Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for PowerSecure stock. At the time of said

·misrepresentations and omissions, Plaintiffs and other members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiffs and other members of the Class and the marketplace known the truth regarding the problems Fusion was experiencing, which were not disclosed by Defendants, Plaintiffs and other members of the Class would not have purchased or otherwise acquired their Fusion stock, or, if they had purchased such stock during the Class Period, they would not have done so at the artificially inflated prices they paid.

123. By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

124. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases of the Company's stock during the Class Period.

## COUNT II

### (For Violations of §20(a) of the Exchange Act against Individual Defendants Hinton and Hutter)

125. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

126. The Individual Defendants acted as controlling persons of PowerSecure within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's business and operations and/or intimate knowledge of the false and misleading statements made by or on behalf of the Company to the investing public, the Individual Defendants each had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements Plaintiff contends are materially false and misleading. The Individual

65

Defendants each were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the power and ability to prevent the issuance of the statements or to cause the statements to be corrected.

127.     In particular, each of these Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

128.     As set forth above, PowerSecure and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of their positions as controlling persons, the Individual Defendants also are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of the wrongful conduct of the Individual Defendants, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's stock during the Class Period and the related damages resulting after the true facts were revealed and the artificial inflation was removed from the price of the stock.

### COUNT III

**(For Violations of §20(b) of the Exchange Act against Individual Defendants Hinton and Hutter)**

129.     Plaintiff repeats and realleges each and every allegation contained above as though fully set forth herein.

130.     The Individual Defendants used their control over PowerSecure to cause the Company to issue materially false and misleading information in violation of Section 10(b) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder.  By virtue of each of the

Individual Defendants' acts resulting in the issuance by PowerSecure of materially false and misleading statements to the public, each of the Individual Defendants, directly or indirectly, engaged in conduct that was unlawful for the Individual Defendants to do under Section 10(b) of the Exchange Act and the rules and regulations promulgated thereunder through another person, PowerSecure.

131. As a direct and proximate result of Defendant PowerSecure's and the Individual Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

132. As a direct and proximate result of the Individual Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's stock during the Class Period based on directly or indirectly relying on the material misstatements and omissions issued by the Company.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

1. Determining that this action is a proper class action, certifying Plaintiff as Class representative under Rule 23 of the Federal Rules of Civil Procedure and Plaintiff's counsel as Lead Counsel;

2. Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

3. Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

4. Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: December 29, 2014

WILSON & RATLEDGE, PLLC

*/s/ Michael A. Ostrander*
Michael A. Ostrander
N.C. State Bar No. 36259
4600 Marriott Drive, Suite 400
Raleigh, North Carolina 27612
Telephone: (919) 787-7711
Facsimile: (919) 787-7710
Email: mostrander@w-rlaw.com

*Counsel for Lead Plaintiff and Liaison Counsel for
the Class*

BROWER PIVEN
   A Professional Corporation
David A.P. Brower
Richard H. Weiss
475 Park Avenue South, 33rd Floor
New York, New York 10016
Telephone: (212) 501-9000
Facsimile: (212) 501-0300
Email: brower@browerpiven.com
Email: weiss@browerpiven.com

BROWER PIVEN
   A Professional Corporation
Charles J. Piven
1925 Old Valley Road
Stevenson, Maryland 21153
Telephone: (410) 332-0030
Facsimile: (410) 685-1300
Email: piven@browerpiven.com

*Counsel for Lead Plaintiff and Lead Counsel for the
Class*

# EXHIBIT A

## PLAINTIFF'S CERTIFICATION

Maguire Financial, LP ("Plaintiff") declares that:

1.    Plaintiff has reviewed the Consolidated Class Action Complaint For Violations Of The Federal Securities Laws in the PowerSecure International, Inc. Securities Litigation and adopts, and would authorize the filing of, that complaint.

2.    Plaintiff did not purchase the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action.

3.    Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.  Plaintiff wants to serve as a lead plaintiff in this litigation either individually or as part of a group, and Plaintiff understands that a lead plaintiff is a representative party who must act on behalf of and in the best interests of other class members in directing the action.  If Plaintiff is appointed as lead plaintiff individually or as part of a group, Plaintiff is ready, willing and able to diligently fulfill the obligations of a lead plaintiff and representative party.

4.    Plaintiff's transactions in PowerSecure International, Inc. securities during the Class Period are set forth on the schedule attached hereto.

5.    During the three years prior to the date of this Certification, Plaintiff has not sought to serve or served as a representative party for a class under the federal securities laws.

6.    Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.  Plaintiff understands that this is not a claim form and that Plaintiff's ability to share in any recovery as a member of the class is unaffected by Plaintiff's decision to serve as a representative party.  Plaintiff has chosen to seek involvement in this litigation as a Lead Plaintiff in order to choose which counsel will represent Plaintiff and the class.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed this ___ day of December 2014.

Maguire Financial, LP

By: _Timothy Maguire_  12/23/14
Timothy Maguire, General Partner

Brower Piven, A Professional Corporation
1925 Old Valley Road
Stevenson, Maryland 21153
Telephone:  410-332-0030
Facsimile:   410-685-1300
www.browerpiven.com

## ATTACHMENT TO CERTIFICATION
PowerSecure International, Inc. Securities Litigation

Name: Maguire Financial, LP

| Number of Shares or Option Contracts | Purchased (P) | Sold (S) | Trade Date | Price Per Share/Contract (Before Commission) |
|---|---|---|---|---|
| 1000 $22.50 4//19/14 Put Options | | S | 3/11/14 | $45.00 |
| 1000 $20.00 6//21/14 Put Options | | S | 5/1/14 | $90.00 |
| 46,000 | P | | 5/1/14 | $21.2069 |
| 47,000 | P | | 5/2/14 | $20.7986 |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

Brower Piven, A Professional Corporation
1925 Old Valley Road
Stevenson, Maryland 21153
Telephone: 410-332-0030
Facsimile: 410-685-1300
www.browerpiven.com