IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
EASTERN DIVISION
No. 4:14-CV-92-D

| | | |
|---|---|---|
| LEONARD C. ASH, Individually and on | ) | |
| Behalf of All Others Similarly Situated, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | **ORDER** |
| | ) | |
| POWERSECURE INTERNATIONAL, | ) | |
| INC., SIDNEY HINTON, and | ) | |
| CHRISTOPHER T. HUTTER, | ) | |
| | ) | |
| Defendants. | ) | |

On May 22, 2014, plaintiff Leonard C. Ash filed a securities class action suit against

PowerSecure International, Inc. ("PowerSecure"), Sidney Hinton, and Christopher T. Hutter

(collectively, "defendants") [D.E. 1]. On October 10, 2014, the court granted a motion to

consolidate this case with two other cases and named Maguire Financial, LP, as lead plaintiff. [D.E.

22]. On December 29, 2014, plaintiffs filed a consolidated securities class action suit against

defendants [D.E. 30]. On February 26, 2015, defendants moved to dismiss the complaint for failure

to state a claim upon which relief can be granted [D.E. 35] and filed a supporting memorandum

[D.E. 36]. Defendants also submitted various materials and asked the court to take judicial notice

of or incorporate by reference these materials in considering the motion to dismiss [D.E. 38]. On

April 30, 2015, plaintiffs responded in opposition to the motion to dismiss [D.E. 47] and the motion

for judicial notice [D.E. 48]. On June 4, 2015, defendants replied [D.E. 49–50]. As explained

below, the court grants defendant's motion for judicial notice and motion to dismiss the complaint.

PowerSecure provides "utility and energy technologies to electric utilities and their industrial, institutional, and commercial customers." Compl. [D.E. 30] ¶ 3. Defendant Hinton is and was the president and chief executive officer ("CEO") of PowerSecure during the proposed class period of August 8, 2013, to May 7, 2014. Id. ¶¶ 1, 21. Defendant Hutter was PowerSecure's chief financial officer ("CFO") during the proposed class period. Id. ¶¶ 1, 22. PowerSecure has three operating segments: interactive distributed generation ("DG"), energy efficiency ("EE"), and utility infrastructure ("UI"). Id. ¶ 3. PowerSecure's DG systems "provide a highly dependable backup power supply during power outages, and provide a more efficient and environmentally friendly source of power during high cost periods of peak power demand." Id. PowerSecure's UI "products and services include transmission and distribution system construction and maintenance, installation of advanced metering and efficient lighting, and emergency storm restoration." Id. The DG and UI segments each contribute approximately 41% of PowerSecure's revenues, with the EE segment contributing most of the remainder. Id. ¶ 4.

Plaintiffs allege that, over the class period, defendants made numerous material misrepresentations and omissions that artificially inflated PowerSecure's publicly-traded share price, thus facilitating two of PowerSecure's acquisitions during the class period and personally enriching Hinton. See, id. ¶¶ 8–15. Plaintiffs state that these misrepresentations and omissions hid from investors that PowerSecure was "encountering significant operational issues and inefficiencies" caused, in part, by a significant geographic change in an existing customer's service area, a longer sales cycle in its DG segment as PowerSecure forwent smaller projects in favor of larger projects, and the unreliability of workflow from a new customer. Id. ¶ 10. Specifically, plaintiffs allege that defendants made materially false or misleading statements or omissions on August 7, 2013,

2

November 6, 2013, March 10, 2014, and April 30, 2014, as well as failing to disclose known trends in violation of SEC regulations. See, e.g., id. ¶¶ 29, 40–41, 50–51, 59, 61.

A.

On August 7, 2013, PowerSecure filed a Form 10-Q for the second quarter of 2013 and issued a press release that stated, in part, "Our second quarter results and all time high backlog illustrate the continued momentum we are seeing across our business as we deliver differentiated, best-in-class solutions to our customers." Id. ¶ 29. The press release quoted Hinton as saying, "PowerSecure has never been in a stronger position for long term success." Id. On a conference call that same day, Hinton made several comments about PowerSecure's business, including "our prospects for this business for continued growth look very, very good," and "we have got our foot on the gas to ensure our continued success in the second half of this year and in 2014 and in 2015 and beyond." Id. ¶¶ 30–31. In discussing PowerSecure's UI segment, Hinton added, among other comments, that the 133% year-over-year growth "just tells you how strong the business is for us and our prospects for this business, for continued growth look very, very good," that PowerSecure had "secure[d] a $49 million three-year contract renewal," and that "the same drivers for this business that we have seen over the past few quarters remain strong." Id. ¶ 33; see also id. ¶ 35.

Plaintiffs allege that these statements were materially false or misleading because defendants failed to adequately disclose that PowerSecure was "experiencing significant and financially draining operational inefficiencies and other problems that inevitably would have a negative impact on revenues and profits." See, e.g., id. ¶¶ 29, 32, 34, 36.

On August 8, 2013, the price of PowerSecure shares rose more than 10% and closed at $17.71 per share. Id. ¶ 37. On August 16, 2013, PowerSecure sold 2.3 million shares of its common stock in a public offering at a price of $16 per share. Id. ¶ 38. On August 16, 2013, Hinton sold

3

200,000 shares of PowerSecure common stock in a public offering at a price of $16 per share. Id. On August 21, 2013, the PowerSecure offering and the Hinton offering each closed. Id.

B.

On November 6, 2013, PowerSecure announced its third-quarter results for 2013 and issued a press release that stated, "[W]e realized inefficiencies in our utility infrastructure unit related to the advanced deployment of crews in anticipation of being selected for a significant long-term revenue opportunity with a major new utility partner." See Id. ¶ 40.[1] After explaining that PowerSecure expected these inefficiencies to affect results for the next two quarters, the press release noted that "[o]perating margin as a percentage of revenue increased 6.2 percentage points to 7.3 percent in 3Q 2013 . . . ." Id. PowerSecure also issued another press release that stated, "Now that the utility has formally selected PowerSecure for this role, specific volumes of work will be determined in the coming quarters. The [C]ompany estimates that in 2014 and 2015 it could be asked to double its work volumes and could realize $25–$35 million of revenue annually . . . ." Id. ¶ 42 (alteration in original).

On a conference call that same day, Hinton commented that "[o]ur third quarter results continued our tremendous momentum in 2013," "our new order flow has been strong," and "[t]he continued progression of our backlog positions us very strongly for continued growth." Id. ¶ 43. In speaking of the UI segment, Hinton also highlighted "a major new utility infrastructure win that has the potential—this is significant. I want to be very clear, this win has the potential to be the largest contract that PowerSecure has ever won." Id. ¶ 45. Hinton further stated that "we currently estimate that in 2014 and 2015 we could be asked to double our work volumes with them and as a

---

[1]The complaint states that PowerSecure released its third-quarter 2014 results on this day, but this appears to be an error. [D.E. 37-8, 37-21].

result realize $25 million to $35 million of revenue annually from this expanded relationship." Id.

Plaintiffs allege that these statements were materially false or misleading because defendants "were only guessing as to the amount of work that might be assigned if the [UI] contract was awarded to PowerSecure," they failed to disclose the extent of their operational inefficiencies, and they were experiencing a longer sales cycle as a result of a decision to "actively seek out larger business opportunities while neglecting [PowerSecure's] smaller projects." Id. ¶¶ 41–43, 46–48.

On November 7, 2013, PowerSecure shares closed at a price of $17.63 per share. Id. ¶ 49.

C.

On March 10, 2014, PowerSecure released its fourth-quarter and full-year financial results for 2013 and held a conference call to discuss the results. Id. ¶ 50. On that conference call, Hinton again discussed the utility company referenced in the November 6, 2013 conference call, stating, "We continue to expect that relationship will yield $25 million to $35 million of revenue annually. However, until we have greater visibility with the customer, we will keep the majority of this work out of our backlog, other than near term revenues that we expect to realize." Id. Hinton added that "we have visibility into what we believe will be another very good year in 2014 for our utility infrastructure business." Id.

Plaintiffs allege that these statements were materially false or misleading because defendants had "no reasonable basis that the described relationship with the new customer would yield $25 million to $35 million of revenue annually" and they failed to disclose that PowerSecure's work backlog was unsustainable. Id. ¶¶ 51–53.

On March 11, 2014, the price of PowerSecure shares reached a class-period high of $27.44 per share in intraday trading and closed at $25.28 per share, a one-day increase of more than 9.4%. Id. ¶ 54.

5

D.

"On or about April 30, 2014, PowerSecure disseminated to its shareholders its 2013 Annual Report, which contained a signed letter from Defendant Hinton to PowerSecure shareholders, dated April 2014." Id. ¶ 59. The signed letter stated that "Our growth continues to be driven by new business awards from new utility partners and by expanding our business with existing partners. . . . [W]e have visibility into what we believe will be another very good year in 2014 for our utility infrastructure business." Id.

Plaintiffs allege that these statements were materially false or misleading because defendants failed to disclose PowerSecure's operational inefficiencies and the increased length of the sales cycle. Id. ¶ 60.

E.

On May 7, 2014, after the close of trading, PowerSecure issued a press release announcing first-quarter results for 2014. Id. ¶ 76. PowerSecure announced a net loss of almost $4.3 million, as gross margins decreased from 30.6% to 20.9%, cost of sales increased 34%, operating expenses increased 39%, and revenue from the DG segment decreased 17%. Id. In a conference call that same day in which defendants Hinton and Hutter explained the financial results, Hinton stated in part that "we had a customer, a key that - I think we said it specifically, that $7.5 million of work in the fourth quarter that we then got $1 million of work in the first one. . . . We adjust, we try to guess the rhythm of how work is released and it's a relatively new account and we just guessed wrong." Id. ¶80– 81.

On May 8, 2014, the price of PowerSecure common stock dropped from $18.60 to $7.00, a decrease of more than 62%, on "extraordinary trading volume of over 10 million shares." See id. ¶ 84.

6

On May 22, 2014, the named plaintiff filed suit against defendants. [D.E. 1]. On October 10, 2014, the court granted a motion to consolidate this case with two other cases and named Maguire Financial, LP, as the lead plaintiff. [D.E. 22]. On December 29, 2014, plaintiffs filed an amended complaint. [D.E. 30].

## II.

The court first addresses defendants' motion for judicial notice and incorporation by reference [D.E. 39]. In ruling on a motion to dismiss, a court must consider "documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322 (2007); see In re PEC Sols., Inc. Sec. Litig., 418 F.3d 379, 388 n.7 (4th Cir. 2005) ("[W]e are not strictly limited to the four corners of the complaint when examining this complaint: since it relies upon a public document a court may as well without converting the motion to dismiss into a motion for summary judgment."); Greenhouse v. MCG Capital Corp., 392 F.3d 650, 656 (4th Cir. 2004) ("[A] court ruling on a 12(b)(6) motion may look to documents or articles cited in the complaint . . . ." (quotation omitted)). Courts may take judicial notice of SEC filings, historical stock prices, and analyst reports (for the purpose of determining disclosure or market knowledge, but not for the truth of the matters asserted in the reports). See Kramer v. Time Warner Inc., 937 F.2d 767, 774 (2d Cir. 1991); see also Cozzarelli v. Inspire Pharm., Inc., 549 F.3d 618, 625 (4th Cir. 2008) (examining documents outside the complaint to determine a disclosure issue); PEC Sols., 418 F.3d at 390 & n.10 (taking judicial notice of the defendants' SEC filings related to sale of stock); Greenhouse, 392 F.3d at 656–57 ("A court ruling on a 12(b)(6) motion may look to . . . SEC filings, press releases, stock price tables, and other material on which the plaintiff's allegations necessarily rely." (quotation omitted)); cf. Von Saher v. Norton Simon Museum of Art at Pasadena, 592 F.3d 400, 406 (9th Cir. 2009) ("Courts may take

7

judicial notice of publications introduced to indicate what was in the public realm at the time, not whether the contents of those articles were in fact true.") (quotation omitted).

Defendants submitted 21 exhibits. See [D.E. 37-3–37-23]. Plaintiffs challenge six of these exhibits as unincorporated documents and, as for the incorporated documents, they challenge the "improper use of any of these Exhibits . . . as evidence of the truth of their contents." [D.E. 48] 3–4 (challenging exhibits 10, 11, 16, 17, 20, and 21 as unincorporated).[2] As for the incorporated documents, the court may "treat such a document as part of the complaint, and thus may assume that its contents are true for purposes of a motion to dismiss under Rule 12(b)(6)." United States v. Ritchie, 342 F.3d 903, 908 (9th Cir. 2003). The court grants defendants' motion for incorporation by reference with respect to these documents.

As for the unincorporated documents, defendants submitted four SEC filings, including Form 4s that Hinton filed concerning his transactions in PowerSecure stock. The SEC filings contained in exhibits 16, 17, 20, and 21, and—in light of the allegations contained in the complaint—the Roth Capital Partners analyst reports in exhibits 10 and 11 are the proper subject of judicial notice. Cf. Phillips v. LCI Int'l, Inc., 190 F.3d 609, 616 (4th Cir. 1999) (reviewing a proxy statement); Kramer, 937 F.3d at 774. Moreover, the court rejects plaintiffs' reliance on Zak v. Chelsea Therapeutics International, Ltd., 780 F.3d 597 (4th Cir. 2015), to exclude Hinton's Form 4s. In Zak, the district court had relied on the defendants' submission of SEC filings regarding their stock transactions in finding that the plaintiffs failed to adequately plead scienter. 780 F.3d at 607–08. The Fourth Circuit reversed, noting that "[a]lthough plaintiffs asserting securities fraud claims frequently bolster allegations regarding scienter by asserting unusual sales of stock by

_____

[2] Plaintiffs do not object to Exhibit 5, a chart of PowerSecure historical prices. [D.E. 48] 4; see Greenhouse, 392 F.3d at 655 n.4.

8

individuals accused of committing securities fraud, the plaintiffs in the present case did not include this type of allegation in their complaint." Id. at 607. Thus, "because the SEC documents were not . . . an integral part of . . . the plaintiffs' complaint, the district court should not have considered those documents in reviewing the sufficiency of the plaintiffs' allegations." Id. Here, in contrast, plaintiffs specifically alleged that Hinton and PowerSecure sold stock during the class period and that these sales, which were "unusual and suspicious in timing and amount" for Hinton, are evidence of scienter. See Compl. [D.E. 30] ¶¶ 98–101. Thus, the court may take judicial notice of the Form 4s and the other unincorporated documents and grants defendants' motion for judicial notice and incorporation by reference [D.E. 38–39].

## III.

A motion to dismiss under Rule 12(b)(6) tests the legal and factual sufficiency of a complaint. See Fed. R. Civ. P. 12(b)(6); Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009); Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555–56 (2007); Vitol, S.A. v. Primerose Shipping Co., 708 F.3d 527, 543 (4th Cir. 2013); Giarratano v. Johnson, 521 F.3d 298, 302 (4th Cir. 2008). The court need not accept a complaint's conclusions of law. See Iqbal, 556 U.S. at 678–79; Twombly, 550 U.S. at 555; Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc., 591 F.3d 250, 255 (4th Cir. 2009). As for a complaint's factual sufficiency, a party must plead "enough facts to state a claim to relief that is plausible on its face." Twombly, 550 U.S. at 570. "[N]aked assertions of wrongdoing" cannot "cross the line between possibility and plausibility of entitlement to relief." Francis v. Giacomelli, 588 F.3d 186, 193 (4th Cir. 2009) (quotation omitted); see Vitol, S.A., 708 F.3d at 543. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." Iqbal, 556 U.S. at 678. A plaintiff armed with nothing more than "labels and conclusions" or a "formulaic recitation of the elements of a cause of

9

action" cannot proceed. Twombly, 550 U.S. at 555 & n.3; Vitol, S.A., 708 F.3d at 543; Francis, 588 F.3d at 193. "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Iqbal, 556 U.S. at 679.

To survive a Rule 12(b)(6) motion to dismiss a fraud claim, a plaintiff generally must "state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). The pleading standard is even higher for alleged violations of section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), codified at 15 U.S.C. § 78j(b), or Rule 10b-5, see 17 C.F.R. 240.10b-5, which the Securities Exchange Commission ("SEC") promulgated under the authority of section 10(b). See 15 U.S.C. § 78u-4(b); Tellabs, 551 U.S. at 313–14; Matrix Capital Mgmt. Fund, LP v. BearingPoint, Inc., 576 F.3d 172, 181–82 (4th Cir. 2009); Teachers' Ret. Sys. of La. v. Hunter, 477 F.3d 162, 172 (4th Cir. 2007).

To establish liability under section 10(b) and Rule 10b-5, a plaintiff must prove six elements: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." Matrixx Initiatives, Inc. v. Siracusano, 131 S. Ct. 1309, 1317 (2011) (quotation omitted); Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc., 552 U.S. 148, 157 (2008); Matrix Capital, 576 F.3d at 181; see also Dura Pharm., Inc. v. Broudo, 544 U.S. 336, 341–42 (2005).

The Private Securities Litigation Reform Act ("PSLRA") also added a safe harbor for certain forward-looking statements. Private Securities Litigation Reform Act of 1995, Pub. L. 104-67, 109 Stat. 737, 749–50 (codified at 15 U.S.C. § 78u-5). This safe harbor precludes liability for allegedly material misrepresentations under certain circumstances, including if (1) the forward-looking

10

statement is "identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement;" (2) the forward-looking statement is immaterial; or (3) the plaintiff fails to prove that the forward-looking statement "if made by a natural person, was made with actual knowledge by that person that the statement was false or misleading." 15 U.S.C. § 78u-5(c)(1). A forward-looking statement includes "a statement containing a projection of revenues, income . . . , earnings . . . per share, . . . or other financial items," "a statement of the plans and objectives of management for future operations, including plans or objectives relating to the products or services of the issuer," and "a statement of future economic performance." 15 U.S.C. § 78u-5(i)(1).

Defendants contend that plaintiffs have failed to sufficiently plead the first two elements: a material misrepresentation or omission, and scienter. Defs.' Mem. Supp. Mot. Dismiss [D.E. 36] 9–10. The court addresses each in turn.

A.

As for the first element, a plaintiff must "specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading." 15 U.S.C. § 78u-4(b)(1); see Matrixx Initiatives, 131 S. Ct. at 1318 n.4. The statement must be "misleading as to a material fact." Matrixx Initiatives, 131 S. Ct. at 1318 (emphasis omitted); Basic Inc. v. Levinson, 485 U.S. 224, 238 (1988). A statement is material if "there is a substantial likelihood that [its] disclosure . . . would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." Matrixx Initiatives, 131 S. Ct. at 1318 (quotation omitted). Section 10(b) and Rule 10b-5 "decidedly do not prohibit any misrepresentation—no matter how willful, objectionable, or flatly false—of immaterial facts, even if it induces reactions from investors that,

11

in hindsight or otherwise, might make the misrepresentation appear material." Greenhouse, 392 F.3d at 656. Immaterial statements include "soft" or "puffing" statements because "the market price of a share is not inflated by vague statements predicting growth." Raab v. Gen. Physics Corp., 4 F.3d 286, 289 (4th Cir. 1993); see City of Monroe Emps.' Ret. Sys. v. Bridgestone Corp., 399 F.3d 651, 671 (6th Cir. 2005) (collecting cases and finding "loosely optimistic statements insufficiently specific" and "too squishy, too untethered to anything measurable, to communicate anything that a reasonable person would deem important to a securities investment decision"); Howard v. Haddad, 962 F.2d 328, 331 (4th Cir. 1992) (finding the alleged misstatements immaterial because "[a]t most they amounted to 'puffery'"). "[P]rojections of future performance not worded as guarantees are generally not actionable under the federal securities laws." Raab, 4 F.3d at 290 (quotation omitted).

Furthermore, "[s]ilence, absent a duty to disclose, is not misleading under Rule 10b-5." Basic, 485 U.S. at 239 n.17. "Rule 10b-5 imposes such a duty to disclose only when silence would make other statements misleading or false." Taylor v. First Union Corp. of S.C., 857 F.2d 240, 243–44 (4th Cir. 1988); see Matrixx Initiatives, 131 S. Ct. at 1321 ("Disclosure is required under these provisions only when necessary to make statements made, in the light of the circumstances under which they were made, not misleading." (quotation and alteration omitted)).

Essentially, plaintiffs' complaint alleges that defendants failed to disclose certain information, including the terms of a new contract with a significant customer, PowerSecure's shift in strategy toward fewer, larger, and more profitable opportunities, and operational inefficiencies driven by a contract with a new UI customer, and that, absent such disclosure, 26 statements that defendants made on August 7, 2013, November 6, 2013, March 10, 2014, and April 30, 2014, were materially false or misleading. The court addresses the statements in chronological order.

1.

On August 7, 2013, defendants made nine statements that plaintiffs claim are materially false or misleading.[3] Eight of these statements, however, are immaterial because they are precisely the kind of "mere expressions of optimism from company spokesmen" that are not actionable under the federal securities laws. Raab, 4 F.3d at 290. For example, a reasonable investor would not rely on Hinton's statements that PowerSecure was seeing "continued momentum . . . across our business," that "PowerSecure has never been in a stronger position for long term success," or that "we have got our foot on the gas to ensure our continued success in the second half of this year and in 2014 and in 2015 and beyond" as guarantees of future performance. Compl. [D.E. 30] ¶¶ 29–31; cf. App. [D.E. 37-2] 1–2 (statements 1–5, 7–9).

With respect to the ninth alleged misrepresentation, plaintiffs claim that Hinton made a material misstatement when he stated that "we were blessed to announce securing a $49 million three-year contract renewal, both the renewal and expansion, with one of the largest investor on utilities in the country." Compl. [D.E. 30] ¶ 33; cf. App. [D.E. 37-2] 1 (statement 6). Plaintiffs argue that this was misleading because the contract was not a renewal but "a new contract in a new, distant location from an existing customer" and that "[a]s a result of this relocation, PowerSecure was forced to hire and train new workers at great expense and essentially start over." Compl. [D.E. 30] ¶ 34. Although defendants argue that there is little real difference between a renewal with the same customer and a new contract with the same customer, see Defs.' Mem. Supp. Mot. Dismiss [D.E. 36] 18, given the relatively small number of contracts that PowerSecure worked on, see Compl. [D.E. 30] ¶ 5, a reasonable investor might find the distinction between the two as having

_____

[3] The court has compared the consolidated complaint with defendants' appendix reciting the highlighted statements and refers (for ease of reference) to the alleged misrepresentations as outlined in the appendix. See App. [D.E. 37-2].

13

significantly altered the total mix of information because the new contract would require a significant investment in hiring and training new personnel and lead to underutilization of existing personnel. See id. ¶ 34. Moreover, the statement is not forward-looking, and therefore does not qualify for the statutory safe harbor, because it is represents a present or historical fact. See 15 U.S.C. § 78u-5(i)(1) (definition of a forward-looking statement). Thus, plaintiffs sufficiently allege that this statement was materially misleading.

2.

On November 6, 2013, defendants made 12 statements that plaintiffs claim are materially false or misleading. See App. [D.E. 37-2] 2–4. Five of these statements are immaterial because they are optimistic expressions, not guarantees of future performance, and a reasonable investor would not view them as significantly altering the total mix of information available. See Compl. [D.E. 30] ¶¶ 43, 45; cf. App. [D.E. 37-2] 3–4 (statements 13, 15, 18, 20, and 21).

Two more statements fall into the statutory safe harbor and thus cannot serve the basis of a private securities claim. PowerSecure stated in a press release, filed with a Form 8-K that Hutter signed, that PowerSecure "estimates that in 2014 and 2015 it could be asked to double its work volumes and could realize $25-$35 million of revenue annually from this expanded relationship." Compl. [D.E. 30] 42; [D.E. 37-21] 14; cf. App. [37-2] 2 (statement 12). This statement falls into the heartland of a forward-looking statement. See, e.g., Ind. State Dist. Council of Laborers & Hod Carriers Pension & Welfare Fund v. Omnicare, Inc., 583 F.3d 935, 943 (6th Cir. 2009) (holding a statement about "growth outlook" immaterial because it "call[ed] attention to its [own] predictive character"); GSC Partners CDO Fund v. Washington, 368 F.3d 228, 242 (3d Cir. 2004) ("Any reasonable reading of this statement, would make one skeptical about the recovery of the full [dollar amount estimated by management].")). The statement was identified as forward looking and

14

accompanied by sufficiently meaningful cautionary language that warned investors of the very risk that was later realized. See [D.E. 37-21] 4, 11 (noting that the statements are "not guarantees" and referring the reader to PowerSecure's Form 10-K); Institutional Inv'rs Grp. v. Avaya, Inc., 564 F.3d 242, 257–58 (3d Cir. 2009); Harris v. Ivax Corp., 182 F.3d 799, 807 (11th Cir. 1999) ("[W]hen an investor has been warned of risks of a significance similar to that actually realized, she is sufficiently on notice of the danger of the investment to make an intelligent decision about it according to her own preferences for risk and reward."). On that day's conference call, Hinton repeated that "we currently estimate that in 2014 and 2015 we could be asked to double our work volumes with them and as a result realize $25 million to $35 million of revenue annually from this expanded relationship." Compl. [D.E. 30] ¶ 45; [D.E. 37-17] 5; cf. App. [D.E. 37-2] 3 (statement 17). Again, this statement is a forward-looking statement that was identified as such and accompanied by meaningful cautionary language. See [D.E. 37-17] 2; [D.E. 37-9] 10; [D.E. 37-21] 11.

The remaining five statements are not materially misleading for lack of adequate disclosure, as plaintiffs claim. In two of them, PowerSecure disclosed the negative effect of operational inefficiencies "related to the advanced deployment of crews in anticipation of being selected for a significant long-term revenue opportunity with a major new utility partner," predicted "some continued inefficiencies," and discussed changes in operating margins. Compl. [D.E. 30] ¶ 40; [D.E. 37-21] 8; cf. App. [D.E. 37-2] 2 (statements 10–11). Thus, defendants disclosed and discussed the very issue that later contributed to the negative financial results of which plaintiffs now complain.

Plaintiffs allege that three more November 6, 2013 statements are misleading because defendants had no reasonable basis for estimating that PowerSecure could realize $25 to $35 million in annual revenues from a new UI customer. See, e.g., Compl. [D.E. 30] ¶¶ 44, 46; [D.E. 37-15] 13; cf. App. [D.E. 37-2] (statements 14, 16, 19). For this argument, which plaintiffs repeat throughout

15

the complaint, see, e.g., Compl. [D.E. 30] ¶¶ 42, 48, 51, 53, plaintiffs rely on a May 7, 2014 statement in which Hinton said, speaking of that new UI customer, "They're a great account. No issue with them at all. We adjust, we try to guess the rhythm of how work is released and it's a relatively new account and we just guessed wrong." [D.E. 37-15] 13 (emphasis added). Plaintiffs' argument—that any guess of future revenue streams has no reasonable basis and is therefore misleading—has no basis in law. See Teachers' Ret. Sys., 477 F.3d at 181 ("A failed venture, standing alone, does not permit a reasonable inference of fraud."); Raab, 4 F.3d at 290 (finding "[p]redictions of future growth" immaterial because such predictions "will almost always prove to be wrong in hindsight" and are "simply the company's best guess as to how the future will play out"). Moreover, plaintiffs' allegations ignore the context of the complete November 6, 2013 conference call, in which Hinton stated, "I want to be clear though, we do not currently have the $25 million to $35 million of annual opportunity in our revenue backlog. The $240 million does not include that. We will add that to the backlog as we see specific volumes start to firm up." Compl. [D.E. 30] ¶ 45; [D.E. 37-17] 5 (emphasis added). In context, Hinton's statements were forward-looking statements, accurately couched as estimates that had yet to "firm up." Thus, they were not materially misleading.

3.

On March 10, 2014, defendants made four statements that plaintiffs allege are materially misleading.[4] The first statement, in which Hinton discussed the new UI contract and reiterated his earlier prediction of $25 to $35 million in annual revenues, is not materially misleading. Compl. [D.E. 30] ¶ 50; [D.E. 37-6] 4–5; cf. App. [D.E. 37-2] 4 (statement 22). Plaintiffs' claim that this

---

[4] Defendants are not liable for statements made by investment analysts. See Janus Capital Grp. v. First Derivative Traders, 131 S. Ct. 2296, 2302–03 (2011); In re aaiPharma Inc. Sec. Litig., 521 F. Supp. 2d 507, 510 (E.D.N.C. 2007).

Case 4:14-cv-00092-D   Document 52   Filed 09/15/15   Page 16 of 27

statement had no reasonable basis because it was a "guess" is incorrect as a matter of law. See Raab, 4 F.3d at 290; see also Teachers' Ret. Sys., 477 F.3d at 181. Similarly, Hutter's statements comparing the current revenue backlog to the past revenue backlog and noting that "our backlog implies continued growth" call attention to their own predictive character and are not materially misleading. See Compl. [D.E. 30] ¶ 53; [D.E. 37-6] 8; Omnicare, 583 F.3d at 943; cf. App. [D.E. 37-2] 5 (statements 24–25). Finally, Hutter's statement that defendants "expect[ed] 2014 gross margins to continue to be in the mid to high 20 percent" is immaterial as a matter of law and, as a forecast of future economic performance, falls within the statutory safe harbor. See Raab, 4 F.3d at 289–90; Compl. [D.E. 30] ¶ 53; [D.E. 37-6] 2 (identifying forward-looking statements); [D.E. 37-8] 11 (meaningful cautionary language); cf. App. [D.E. 37-2] 5 (statement 23).

4.

On April 30, 2014, Hinton signed a letter in which he stated, in part, that "With our expanding utility relationships, strong backlog, and the high quality of our sales pipeline, we have visibility into what we believe will be another very good year in 2014 for our utility infrastructure business." Compl. [D.E. 30] ¶ 59–60; cf. App. [D.E. 37-2] 5 (statement 26). This statement amounts to puffery and is immaterial as a matter of law. See Raab, 4 F.3d at 289–90.

5.

Plaintiffs also allege that defendants violated section 10(b) and Rule 10b-5 when they "failed to disclose known trends" in violation of Item 303 of SEC Regulation S-K. Compl. [D.E. 30] ¶ 61. Item 303 requires companies to describe, in certain SEC filings, "any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." 17 C.F.R. § 229.303(a)(3)(ii). Plaintiffs allege that defendants had an "affirmative duty to disclose known trends

17

or uncertainties" and that they failed to do so thereby violating the federal securities laws. Compl. [D.E. 30] ¶¶ 63–67.

Item 303 does not create a private right of action. See Oran v. Stafford, 226 F.3d 275, 287 (3d Cir. 2000) (Alito, J.). Plaintiffs' argument relies on the implicit claim that a violation of Item 303 amounts to a per se violation of section 10(b) and Rule 10b-5. The Fourth Circuit has not ruled on this issue.

In Oran, the Third Circuit considered whether Item 303 imposed on the defendant an "affirmative obligation to disclose," under section 10(b) and Rule 10b-5, several studies linking the defendant's drugs to heart-valve defects. See Oran, 226 F.3d at 279, 287. As then-Judge Alito noted in his opinion for the Third Circuit, Item 303's "disclosure obligations extend considerably beyond those required by Rule 10b-5." Id. at 288. The Oran court reasoned that, because the materiality standards under Rule 10b-5 and Item 303 differed significantly, a duty to disclose under Rule 10b-5 "must be separately shown." Id. The Oran court concluded that because "plaintiffs have failed to plead any actionable misrepresentation or omission under . . . Rule [10b-5], SK-303 cannot provide a basis for liability." Id.; see also In re NVIDIA Corp. Sec. Litig., 768 F.3d 1046, 1054–56 (9th Cir. 2014) ("In sum, we hold that Item 303 does not create a duty to disclose for purposes of Section 10(b) and Rule 10b-5. Such a duty to disclose must be separately shown . . . ."); Shah v. GenVec, Inc., No. 8:12-cv-341-DKC, 2013 WL 5348133, at *15 n.16 (D. Md. Sept. 20, 2013) (unpublished); Iron Workers Local 16 Pension Fund v. Hilb Rogal & Hobbs Co., 432 F. Supp. 2d 571, 583 (E.D. Va. 2006).

In opposition to this analysis, plaintiffs cite Stratte-McClure v. Morgan Stanley, 776 F.3d 94 (2d Cir. 2015), and argue that the NVIDIA court misread Oran. In Stratte-McClure, the Second Circuit held that "Item 303's affirmative duty to disclose in Form 10-Qs can serve as the basis for

18

a securities fraud claim under Section 10(b)." 776 F.3d at 101. The Stratte-McClure court concluded that Oran was not contrary because of then-Judge Alito's statement that "a violation of SK-303's reporting requirement does not automatically give rise to a material omission under Rule 10b-5." Id. at 103 (quoting Oran, 226 F.3d at 288). Thus, the Stratte-McClure court reasoned, Oran suggested that an Item 303 violation could give rise to a material Rule 10b-5 omission "so long as the omission is material under Basic, and the other elements of Rule 10b-5 have been established." Id. at 103–04.

This court finds Oran's reasoning, and NVIDIA's interpretation of Oran, persuasive. When then-Judge Alito's statement that "a violation of SK-303's reporting requirements does not automatically give rise to a material omission under Rule 10b-5" is placed in full context of the discussion, including the significant differences in materiality standards under the two rules, it is apparent that Oran required a plaintiff to independently show a duty to disclose under Rule 10b-5 standards. See Oran, 226 F.3d at 287–88. Item 303 is not a magic black box in which inadequate allegations under Rule 10b-5 are transformed, by means of broader and different SEC regulations, into adequate allegations under Rule 10b-5. See Exchange Act Release No. 34-26831, 54 Fed. Reg. 22,427, 22,430 n.27 (May 24, 1989) ("[Item 303] mandates disclosure of specified forward-looking information, and specifies its own standard for disclosure—i.e., reasonably likely to have a material effect. This specific standard governs the circumstances in which Item 303 requires disclosure. The probability/magnitude test for materiality approved by the Supreme Court in Basic . . . is inapposite to Item 303 disclosure."). A plaintiff cannot seek to bring an action under Rule 10b-5 in the guise of an Item 303 violation when the same underlying alleged omissions are not sufficient to state a Rule 10b-5 violation. Compare Compl. [D.E. 30] ¶¶ 34, 36, 41, with Compl. [D.E. 30] ¶ 63. Rather, as then-Judge Alito properly concluded in Oran, "[s]uch a duty to disclose must be separately

19

shown." Oran, 226 F.3d at 288. Thus, plaintiffs' allegation that defendants violated Item 303 fails to state a claim.

In sum, plaintiffs sufficiently allege one material misrepresentation: Hinton's August 7, 2013 statement that PowerSecure had secured a $49 million three-year contract renewal when the contract was in a different geographic area and would require the hiring and training of new workers. See Compl. [D.E. 30] ¶ 33. The remaining statements are immaterial, fall within the statutory safe harbor, or are not false or rendered misleading by inadequate disclosure.

B.

As for the second element, a plaintiff must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A). The required state of mind is scienter, or "a mental state embracing intent to deceive, manipulate, or defraud." Tellabs, 551 U.S. at 319 (quotation omitted). A strong inference is one that is "more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." Id. at 314. "This standard requires courts to take into account plausible opposing inferences." Matrixx Initiatives, 131 S. Ct. at 1324 (quotation omitted); see Tellabs, 551 U.S. at 323–24 ("To determine whether the plaintiff has alleged facts that give rise to the requisite strong inference of scienter, a court must consider plausible, nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff." (quotation omitted). In comparing alternative inferences, the court considers all allegations holistically. Matrixx Initiatives, 131 S. Ct. at 1324; Tellabs, 551 U.S. at 323.

The Fourth Circuit has held that, in addition to intentional misconduct, "pleading recklessness is sufficient to satisfy the scienter requirement." Matrix Capital, 576 F.3d at 181; see Cozzarelli, 549 F.3d at 623; cf. Matrixx Initiatives, 131 S. Ct. at 1323–24 (assuming without

20

deciding that recklessness may establish scienter). In the context of section 10(b), a reckless act is one "so highly unreasonable and such an extreme departure from the standard of ordinary care as to present a danger of misleading the plaintiff to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." Matrix Capital, 576 F.3d at 181 (quotation omitted); see Zak, 780 F.3d at 613 ("[T]he recklessness necessary to support a finding of scienter must be 'severe.'"); Pub. Emps.' Ret. Ass'n of Colo. v. Deloitte & Touche LLP, 551 F.3d 305, 313 (4th Cir. 2009); Cozzarelli, 549 F.3d at 623. The scienter requirement is not met if "the inference that defendants acted innocently, or even negligently, [is] more compelling than the inference that they acted with the requisite scienter." Pub. Emps. Ret. Ass'n, 551 F.3d at 313; see Zak, 780 F.3d at 613 (noting that the scienter requirement "prevents section 10(b) from devolving into a penalty for business decisions that, in hindsight, appear questionable").

Plaintiffs make three broad allegations concerning scienter: (1) as senior executive officers, Hutter and Hinton had access to and were briefed on information about the day-to-day affairs of the company and therefore knew about the difficulties facing the UI segment; (2) a confidential witness (CW1) alleges that "problems affecting the Company's UI business significantly pre-dated the May 2014 disclosures"; and (3) PowerSecure and Hinton had pecuniary motives to deliberately mislead the public. See Compl. [D.E. 30] ¶¶ 86–101.

Viewing the single alleged material misrepresentation regarding whether a UI contract was new or renewed, plaintiffs' complaint fails to adequately plead scienter and therefore fails to state a claim under section 10(b) and Rule 10b-5. See Matrix Capital, 576 F.3d at 187 (determining whether defendants acted with scienter "with respect to those [misstated or misleading] statements"). Alternatively, viewing all the allegations in the complaint and attached documents holistically, plaintiffs have failed to state with particularity facts giving rise to a strong inference that defendants

21

acted with scienter. As explained below, the more plausible inference is that defendants, at most, negligently failed to adequately disclose additional information about the extent of operational inefficiencies and a change in corporate strategy that failed to result in the predicted growth.

As for defendants' positions in the company, apart from alleging that Hutter was one of PowerSecure's "most senior executive officers . . . responsible for overseeing [PowerSecure's] business and operations day-to-day," Compl. [D.E. 30] ¶ 87, most of the allegations center on Hinton's role as CEO. See id. ¶¶ 87–90. The complaint alleges that Hinton managed a "matrix organization," had "numerous direct reports including multiple sales leaders, product leaders, operations leaders and functional leaders," and operated "the day-to-day business in direct contact with individual sales leaders." Id. ¶ 88 (quotation omitted). Plaintiffs do not, however, state any facts showing that defendants actually knew of the alleged problems in the UI segment. Cf. City of Roseville Emps.' Ret. Sys. v. Sterling Fin. Corp., 963 F. Supp. 2d 1092, 1119 (E.D. Wash. 2013).[5] Rather, they rely on the testimony of CW1, a former "Senior Vice President of Sales in the UI group, from late 2011 through January 2014." Compl. [D.E. 30] ¶ 92. According to CW1, problems with the UI group started as early as May 2013, when PowerSecure had to "shut the two or three offices it had been operating in the area of West Palm Beach, Florida" and start over in Ft. Meyers, Florida, after gaining a new contract with Florida Power & Light Company ("FP&L"). Id. ¶ 93. Thus, plaintiffs' complaint relies on the combination of CW1's allegations of problems existing as far back as May 2013 and Hinton's and Hutter's positions as PowerSecure's senior executive officers to create the inference that both defendants actually knew about the problems in the UI segment.

_____

[5] The complaint lacks the "detailed allegations establishing the defendants' actual exposure" sufficient to base knowledge on the "core operations" doctrine. See Yates v. Mun. Mortg. & Equity, LLC, 744 F.3d 874, 890 (4th Cir. 2014); In re Autodesk, Inc. Sec. Litig., 132 F. Supp. 2d 833, 843–44 (N.D. Cal. 2000); cf. Compl. [D.E. 30] ¶ 87 (alleging that "the matters at issue here . . . were at the core of the Company's business and were critical to its overall performance and prospects").

CW1's allegations are fatally undermined in at least two ways. First, the complaint does not allege that CW1 had personal knowledge of the FP&L contract or the Texas-based Oncor project. See id. ¶¶ 93–94. Rather, the complaint only alleges that CW1 was "in a position at the Company to have personal knowledge" and lists CW1's job title. Id. ¶ 92 (emphasis added). This conclusory allegation does not establish personal knowledge of CW1's subsequent statements, particularly when that knowledge is not corroborated by other evidence. See Zucco Partners, LLC v. Digimarc Corp., 552 F.3d 981, 995–96 (9th Cir. 2009); In re Trex Co. Sec. Litig., 454 F. Supp. 2d 560, 573 (W.D. Va. 2006) (plaintiffs bear the burden of proving personal knowledge). Second, the complaint fails to allege that CW1 had any communications or meetings with Hinton or Hutter, thus precluding personal knowledge of what those defendants actually knew. Accordingly, the court declines to credit CW1's allegations. See, e.g., Zucco Partners, LLC, 552 F.3d at 995–96; Pipefitters Local No. 636 Defined Benefit Plan v. Tekelec, No. 5:11-CV-4-D, 2013 WL 1192004, at *12 (E.D.N.C. Mar. 22, 2013) (unpublished); City of Pontiac Gen. Emps.' Ret. Sys. v. Stryker Corp., 865 F. Supp. 2d. 811, 834 n.9 (W.D. Mich. 2012); In re Trex Co., 454 F. Supp. 2d at 573.

Finally, plaintiffs' allegations of the pecuniary motives of PowerSecure and Hinton do not support a strong inference of scienter. As for PowerSecure, the August 16, 2013 public offering of 2.3 million shares—nine days into the proposed class period—adds little inference of fraud. See Cozzarelli, 549 F.3d at 627 ("[A] strong inference of fraud does not arise merely from seeking capital to support a risky venture."); Compl. [D.E. 30] ¶ 98 (alleging that PowerSecure received \$34.4 million in "needed funds"). The October 8, 2013 acquisition of Encari, LLC is somewhat more probative of pecuniary motive, although the complaint alleges only that there was "potential additional earn-out consideration" that would be half-financed by PowerSecure common stock, without detailing the conditions under which PowerSecure would actually pay, whereas the primary

payment was a cash payment of $4.8 million. Compl. [D.E. 30] ¶ 99 (emphasis added).

As for Hinton, plaintiffs allege that he effectively made three stock sales during the class period: 200,000 shares on August 16, 2013; 138,770 shares on December 19, 2013, pursuant to a separation agreement for his pending divorce; and 10,000 shares on February 4, 2014, also pursuant to his pending divorce. Compl. [D.E. 30] ¶ 100. The latter two sales do not raise an inference of scienter because they were made pursuant to a "final division of marital assets in conjunction with the Reporting Person's pending divorce." [D.E. 37-22] 7, 9; see Teachers' Ret. Sys., 477 F.3d at 184 ("[I]nsider trading can imply scienter only if the timing and amount of a defendant's trading were 'unusual or suspicious.'"); Ronconi v. Larkin, 253 F.3d 423, 435 (9th Cir. 2001) ("Insider trading is suspicious only when it is dramatically out of line with prior trading practices at times calculated to maximize the personal benefit from undisclosed inside information." (quotation and alterations omitted)); In re Integrated Elec. Servs., No. 4:04-CV-3342, 2006 U.S. Dist. LEXIS 1425, at *4–6 (S.D. Tex. Jan. 10, 2006) (unpublished). As for the first sale, Hinton offered for sale 200,000 shares on August 16, 2013, or roughly 32% of his then-current holdings, and the sale closed on August 21, 2013. Compl. [D.E. 30] ¶ 100; see [D.E. 37-22] 3. Plaintiffs allege that this sale was out of line with prior trading practices. Compl. [D.E. 30] ¶ 101. This sale, however, does not support a strong inference of scienter for several reasons: (1) the public offering came nine days into the proposed class period and after only five of the twenty-six alleged misleading statements, the only material one of which was that Hinton improperly referred to a contract as a renewal rather than a new contract;[6] (2) the amount of the offering, which was roughly 32% of his then-current holdings, was

---

[6] Again, the court declines to credit, for lack of personal knowledge, CW1's allegation that "problems affecting the Company's UI business significantly pre-dated the May 2014 disclosures, as far back as the beginning of the Class Period." Compl. [D.E. 30] ¶92. Furthermore, even if credited, CW1's allegation that "the UI group stopped growing in the third and fourth quarters of 2013" is not probative of Hinton's knowledge of any alleged operational inefficiencies or other

24

offset less than four months later with his December 5, 2013 receipt of 275,000 shares (albeit restricted shares), followed by an April 7, 2014 receipt of an additional 17,015 restricted shares, resulting in a net positive change (excluding the shares sold as part of the divorce agreement), [D.E. 37-22] 5, 11; and (3) the failure of Hutter, his alleged coconspirator, to sell any PowerSecure shares. See, e.g., Cozzarelli, 549 F.3d at 627–28 (declining to find a strong inference of scienter where defendants "sold 13%, 12%, and 3% of their holdings" and "the total holdings of each defendant increased" while the defendants allegedly failed to adequately disclose information regarding an ongoing medical study); Metzler Inv. GMBH v. Corinthian Colls., Inc., 540 F.3d 1049, 1067 (9th Cir. 2008) (declining to find scienter where a defendant sold 37% of his shares because "[w]e typically require larger sales amounts[—]and corroborative sales by other defendants—to allow insider trading to support scienter"); Ronconi, 253 F.3d at 436 ("One insider's well timed sales do not support the 'strong inference' required by the statute where the rest of the equally knowledgeable insiders act in a way inconsistent with the inference that the favorable characterizations of the company's affairs were known to be false when made." (citation omitted)); In re Advanta Corp. Sec. Litig., 180 F.3d 525, 540 (3d Cir. 1999), abrogation on other grounds recognized by Institutional Inv'rs Grp. v. Avaya, Inc., 564 F.3d 242, 276 (3d Cir. 2009); In re Dot Hill Sys. Corp. Sec. Litig., 594 F. Supp. 2d 1150, 1161 (S.D. Cal. 2008) ("The insider trading allegations are problematic because the insider sales . . . preceded the vast majority of the alleged misrepresentations.").[7]

---

problems as of the August 7, 2013 statement, just over one month into the third quarter. See id. ¶ 94.

[7] Plaintiffs attempt to distinguish Metzler by citing the court's reasoning that the defendant "sold in a manner consistent with their pre-Class Period sales." Pls.' Mem. Opp'n Mot. Dismiss [D.E. 47] 45 n.42; see Metzler, 540 F.3d at 1067. That reasoning, however, was in addition to the court's independent rationale that larger sales amounts were required to "allow insider trading to support scienter." Metzler, 540 F.3d at 1067. Moreover, with respect to Hutter's lack of sales, the cases that plaintiffs cite stand only for the proposition that the absence of sales by coconspirators is

Case 4:14-cv-00092-D   Document 52   Filed 09/15/15   Page 25 of 27

Hinton's sale of stocks supports, at best, a very weak inference of scienter.

In sum, viewing all the allegations holistically, plaintiffs' complaint fails to "state with particularity facts giving rise to a strong inference" that defendants acted with scienter or severe recklessness. Excluding CW1's allegations for lack of personal knowledge, the complaint essentially states that defendants must have known of or recklessly disregarded the operational inefficiencies, possible failure of a change in corporate strategy to pursue higher-margin projects, and the possibility of a new client delaying work, supported by the fact that PowerSecure and Hinton made public offerings of PowerSecure common stock nine days into the proposed class period. This inference of scienter is not as compelling as the competing inference that defendants innocently or negligently failed to fully disclose to the market (and competitors) information about the change in corporate strategy to pursue higher-margin opportunities, and the extent of existing and potential operational inefficiencies driven by estimates of future work flow. See Zak, 780 F.3d at 613 (the scienter requirement "prevents section 10(b) from devolving into a penalty for business decisions that, in hindsight, look questionable"). Thus, looking at all allegations, plaintiffs have failed to adequately plead scienter.

Here, plaintiffs have failed to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A). Thus, the court grants defendants' motion to dismiss count one.

## IV.

Plaintiffs also allege violations of sections 20(a) and 20(b) of the Exchange Act by Hinton and Hutter. Compl. [D.E. 30] ¶¶ 125–32. In light of the disposition of plaintiffs' section 10(b) and

---

not dispositive, not whether the court can use the lack of allegations in weighing competing inferences. See Pls. Mem. Opp'n Mot. Dismiss [D.E. 47] 46.

Rule 10b-5 claim, the court dismisses these counts and the complaint as a whole. Cozzarelli, 549

F.3d at 628. In so doing, the court gives leave to plaintiffs to amend their complaint. See Pls.' Mem.

Opp'n Mot. Dismiss. [D.E. 47] 16 n.7.

V.

In sum, the court GRANTS defendants' motion for judicial notice and incorporation by

reference [D.E. 38] and motion to dismiss [D.E. 35]. The court hereby DISMISSES without

prejudice plaintiffs' complaint. If plaintiffs elect to amend their complaint, they shall file the

amended complaint by October 16, 2015. Defendants shall have until November 23, 2015, to file

any renewed motion to dismiss.

SO ORDERED. This 15 day of September 2015.

JAMES C. DEVER III
Chief United States District Judge