IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
EASTERN DIVISION
No. 4:14-CV-92-D

| | | |
|---|---|---|
| LEONARD C. ASH, Individually and on Behalf of All Others Similarly Situated, | ) ) ) | |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | **ORDER** |
| POWERSECURE INTERNATIONAL, INC., SIDNEY HINTON, and CHRISTOPHER T. HUTTER, | ) ) ) ) ) | |
| Defendants. | ) | |

On May 22, 2014, plaintiff Leonard C. Ash filed a securities class action suit against PowerSecure International, Inc. ("PowerSecure"), Sidney Hinton ("Hinton"), and Christopher T. Hutter ("Hutter") [D.E. 1]. On October 10, 2014, the court granted a motion to consolidate this case with two other cases and named Maguire Financial, LP, as lead plaintiff [D.E. 22]. On December 29, 2014, plaintiffs filed a consolidated securities class action suit [D.E. 30]. On February 26, 2015, the defendants named in the original complaint moved to dismiss the complaint for failure to state a claim upon which relief can be granted [D.E. 35]. On September 15, 2015, this court granted defendants' motion to dismiss, dismissed without prejudice plaintiffs' complaint, and allowed plaintiffs to file an amended complaint. See [D.E. 52].

On October 16, 2015, plaintiffs filed an amended complaint against PowerSecure and Hinton (collectively, "defendants") [D.E. 53]. On November 23, 2015, defendants moved to dismiss the amended complaint [D.E. 54] and filed a supporting memorandum [D.E. 55] and numerous exhibits

[D.E. 56-1 through D.E. 56-16]. Defendants also submitted various materials and asked the court to take judicial notice of or to incorporate by reference these materials in considering defendants' motion to dismiss [D.E. 57]. On January 13, 2016, plaintiffs responded in opposition to defendants' motions [D.E. 62 through D.E. 63]. On February 5, 2016, defendants replied [D.E. 66 through D.E. 67]. As explained below, the court grants defendants' motion to dismiss and denies as moot defendants' motion for judicial notice.

I.

PowerSecure "provides utility and energy technologies to electric utilities and their customers." Am. Compl. [D.E. 53] ¶ 8. Defendant Hinton is the president and chief executive officer ("CEO") of PowerSecure and served in those roles during the proposed class period of August 7, 2013, to May 7, 2014. Id. ¶¶ 11, 14. PowerSecure has three operating segments: interactive distributed generation ("DG"), energy efficiency ("EE"), and utility infrastructure ("UI"). Id. ¶ 8. PowerSecure's UI "products and services include transmission and distribution system construction and maintenance, installation of advanced metering and efficient lighting, and emergency storm restoration." Id. In 2013, the UI segment alone generated 41% of PowerSecure's revenues. Id.

Plaintiffs' amended complaint involves a single representation defendants made regarding PowerSecure's relationship with Florida Power & Light ("FP&L"). During the class period, FP&L was the "largest electric utility in Florida" and had held a three-year contract with PowerSecure that was set to expire. See id. ¶¶ 2, 21. In 2013, FP&L's contract represented roughly 10% of PowerSecure's UI revenues, or 4.1% of PowerSecure's overall business portfolio. See id. ¶ 30. FP&L's expiring contract with PowerSecure involved the West Palm Beach, Florida, area. See id. ¶¶ 23, 30.

2

On August 7, 2013, the first day of the class period, Hinton (on behalf of PowerSecure) stated during a "conference call and live webcast for securities analysts and investors" that PowerSecure was "blessed to announce securing a $49 million three-year contract renewal" with FP&L. Id. ¶ 20 (quotation omitted). Though Hinton characterized the contract with FP&L as a "renewal," it involved an entirely new geographic area than did the expired contract. See id. ¶¶ 21–23; [D.E. 52] 13–14. As a result, this new contract introduced inefficiencies into PowerSecure's UI operations. Because the new contract covered work for FP&L in Fort Meyers, Florida, PowerSecure ultimately "had to shut" the offices it had operated during the duration of the previous contract in West Palm Beach, Florida. Am. Compl. ¶¶ 22–23, 30. PowerSecure's West Palm Beach employees "jumped ship and went to work for another contractor," and PowerSecure "was forced to hire and train new workers at great expense." Id. ¶¶ 22–23, 30.

According to plaintiffs, the market reacted positively to Hinton and PowerSecure's August 7, 2013 statement regarding the FP&L contract. Specifically, plaintiffs allege that Hinton's August 7, 2013 statement regarding the FP&L renewal caused PowerSecure's common stock to "r[ise] $1.74 per share, more than 10%, to close at $17.71 per share" the following day. Id. ¶ 24. Numerous securities analysts issued "extremely positive" ratings for PowerSecure. See id. ¶ 26. On August 16, 2013, plaintiffs allege that PowerSecure took advantage of the positive reaction to the August 7, 2013 statement and sold 2.3 million shares at $16 per share, raising "$34.4 million in net proceeds." Id. ¶ 25. That same day, Hinton "sold 200,000 shares of PowerSecure common stock from his personal holdings . . . at the same price and on the same terms as the Company Offering, which yielded him $3.2 million in proceeds." Id.

On May 7, 2014, despite analysts' and the market's expectations, PowerSecure reported losses of almost $4.3 million for the first quarter of 2014. Id. ¶ 27. That same day, Hinton discussed

3

openly in a conference call that FP&L had "changed the geographies [PowerSecure was] serving" in its new contract and that inefficiencies resulting out of the new contract contributed to PowerSecure's difficulties in the first quarter. See id. ¶ 30. On May 8, 2014, numerous analysts "slashed their ratings and price targets" for PowerSecure, and PowerSecure's shares "plunged more than 62% from the $18.60 closing price on May 7 . . . to close at just $7.00 on May 8." Id. ¶¶ 31–32.

Plaintiffs claim that "the market price of PowerSecure securities was artificially inflated during the Class Period" due to defendants' August 7, 2013, statement regarding the FP&L contract. See id. ¶ 68. As a result, plaintiffs claim that they purchased "securities during the Class Period at artificially high prices and were damaged after the truth regarding the Company finally was revealed." Id. Plaintiffs believe that defendants "engaged and participated in a continuous course of conduct to conceal and misrepresent adverse material information about the business, operations, performance, and prospects of PowerSecure." Id. ¶ 65. Accordingly, plaintiffs allege that defendants violated section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), codified at 15 U.S.C. section 78j(b), as well as Rule10b-5, 17 C.F.R. section 240.10b-5. See id. ¶¶ 62–72.

The court's order of September 15, 2015, discusses the law applicable to plaintiffs' claim under section 10(b) of the Exchange Act and Rule 10b-5 and defendants' motion to dismiss under Rule 12(b)(6). See [D.E. 52] 9–27. The court will not repeat that discussion and applies the law discussed in the order of September 15, 2015. Additionally, the court declines to revisit its earlier holding that plaintiffs sufficiently alleged that defendants' August 7, 2013 statement amounted to a material misrepresentation. See id. 13–14. Accordingly, the court limits its analysis in this order to whether plaintiffs' amended complaint plausibly alleges scienter under section 10(b) of the Exchange Act.

4

II.

To plead a claim under section 10(b) of the Exchange Act, a plaintiff must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A). The required state of mind is scienter, or "a mental state embracing intent to deceive, manipulate, or defraud." Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 319 (2007) (quotation omitted). A strong inference is one that is "more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." Id. at 314. "This standard requires courts to take into account plausible opposing inferences." Matrixx Initiatives, Inc. v. Siracusano, 563 U.S. 27, 48 (2011) (quotation omitted); see Tellabs, 551 U.S. at 323–24 ("To determine whether the plaintiff has alleged facts that give rise to the requisite strong inference of scienter, a court must consider plausible, nonculpable explanations for the defendants' conduct, as well as inferences favoring the plaintiff." (quotation omitted)). In comparing alternative inferences, the court considers all allegations holistically. See Matrixx Initiatives, 563 U.S. at 48–49; Tellabs, 551 U.S. at 323–24.

The Fourth Circuit has held that, in addition to intentional misconduct, "[p]leading recklessness is sufficient to satisfy the scienter requirement." Matrix Capital Mgmt. Fund, LP v. BearingPoint, Inc., 576 F.3d 172, 181 (4th Cir. 2009); see Cozzarelli v. Inspire Pharm., Inc., 549 F.3d 618, 623 (4th Cir. 2008); cf. Matrixx Initiatives, 563 U.S. at 48 (assuming without deciding that recklessness may establish scienter). In the context of section 10(b), a reckless act is one "so highly unreasonable and such an extreme departure from the standard of ordinary care as to present a danger of misleading the plaintiff to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." Matrix Capital, 576 F.3d at 181 (quotation omitted); see Zak v. Chelsea Therapeutics Int'l, Ltd., 780 F.3d 597, 613 (4th Cir. 2015) ("[T]he

5

recklessness necessary to support a finding of scienter must be 'severe.'"); Pub. Emps.' Ret. Ass'n v. Deloitte & Touche LLP, 551 F.3d 305, 313 (4th Cir. 2009); Cozzarelli, 549 F.3d at 623. The scienter requirement is not met if "the inference that defendants acted innocently, or even negligently, [is] more compelling than the inference that they acted with the requisite scienter." Pub. Emps.' Ret. Ass'n, 551 F.3d at 313; see Zak, 780 F.3d at 613 (noting that the scienter requirement "prevents section 10(b) from devolving into a penalty for business decisions that, in hindsight, appear questionable").

A.

Plaintiffs' initial complaint made three broad allegations concerning scienter: (1) as CEO, Hinton had access to information about the day-to-day affairs of the company and therefore knew about the difficulties facing PowerSecure's UI segment; (2) a confidential witness (CW1) alleged that "problems affecting the Company's UI business significantly pre-dated the May 2014 disclosures"; and, (3) PowerSecure and Hinton had pecuniary motives to deliberately mislead the public. See Compl. [D.E. 30] ¶¶ 86–101. On September 15, 2015, the court held that plaintiffs' complaint "fail[ed] to adequately plead scienter and therefore fail[ed] to state a claim under section 10(b) and Rule 10b-5." [D.E. 52] 21. Alternatively, the court held that the allegations in the original complaint and other reviewable documents, when reviewed holistically, failed to state with particularity facts giving rise to a strong inference of scienter. Id. 21–26.

Plaintiffs' amended complaint raises largely the same allegations regarding scienter as in their initial complaint. Compare Compl. ¶¶ 86–101, with Am. Compl. ¶¶ 34–49. Accordingly, the court adopts its analysis from the order of September 15, 2015, and, unless otherwise noted, holds that plaintiffs have failed to state a claim even when viewing the unchanged allegations holistically and in conjunction with the new allegations in the amended complaint. Nonetheless, plaintiffs'

6

amended complaint contains new allegations that merit some discussion.

Plaintiffs' amended complaint raises the following new allegations regarding defendants' incentive to commit securities fraud: (1) that, having already stated that PowerSecure would obtain a contract renewal from FP&L before the class period, Hinton was "likely" hesitant to "concede to the market that . . . the customer did not renew the Company's contract"; (2) that PowerSecure had a pecuniary incentive to defraud the market, as the "money raised from the public" due to the alleged misstatement "provided PowerSecure with additional cash" to defray the costs resulting from FP&L's new contract in a different geographic area; and, (3) that Hinton had incentive to defraud the market in order to realize "considerable savings . . . by transferring shares at an artificially inflated price to his wife" as part of Hinton's divorce settlement. See Am. Compl. ¶¶ 37, 45, 49. Additionally, plaintiffs argue that because the court's order of September 15, 2015, found that plaintiffs had sufficiently pleaded that the August 7, 2013 statement was a material misrepresentation, Hinton "certainly . . . knew" that this statement was false. See id. ¶ 36.

1.

As for plaintiffs' claim that Hinton possessed an incentive to defraud the market to avoid "conced[ing] to the market that, in fact, the customer did not renew the Company's contract," the court holds that this assertion is conclusory regarding Hinton's knowledge and fails to support a strong inference of scienter. Cf. id. ¶ 37. The amended complaint does not state specifically why Hinton would hesitate to correct his earlier statements to the public. See id.[1] Insofar as the amended complaint suggests that Hinton did so to "save face," the mere "preservation of reputation" does not

---

[1] The complaint alleges that, on May 8, 2013, three months before the class period began, PowerSecure stated through Hinton that it was "renewal time" with "a utility we are already serving." Am. Compl. ¶ 18. Additionally, on June 6, 2013, PowerSecure announced through a press release that it had secured a "renewed and expanded three year utility infrastructure (UI) award to serve one of the nation's largest investor owned utilities (IOUs)." Id. ¶ 19 (emphasis omitted).

7

"constitute a cognizable motive for fraud" under the Exchange Act. In re Moody's Corp. Sec. Litigation, 599 F. Supp. 2d 493, 515 (S.D.N.Y. 2009); see Rombach v. Chang, 355 F.3d 164, 177 (2d Cir. 2004); Varjabedian v. Emulex Corp., 152 F. Supp. 3d 1226, 1238–39 (C.D. Cal. 2016) (collecting cases). Accordingly, this allegation, even when viewed holistically and in conjunction with the remainder of the amended complaint, does not aid in curing the defects identified in this court's order of September 15, 2015.

2.

As for plaintiffs' claim that defendants had incentive to defraud the market in order to raise funds to offset the costs of the new contract with FP&L, plaintiffs raised a similar claim in their initial complaint. See Compl. ¶ 98 ("[T]he Company sold 2.3 million shares of its common stock to the public at $16 per share, a price that was artificially inflated as a result of Defendants' deceptive statements and omissions, yielding the Company $34.4 million in needed funds. Thus, Defendants had an obvious motive to defraud the market."). Although slightly more specific than the allegations in the initial complaint regarding the proposed rationale for allegedly committing fraud, this allegation fails for the reasons outlined in this court's order of September 15, 2015. See [D.E. 52] 23–24; Cozzarelli, 549 F.3d at 627 ("[A] strong inference of fraud does not arise merely from seeking capital to support a risky venture."). Accordingly, this allegation, even when viewed holistically and in conjunction with the remainder of the amended complaint, does not aid in curing the defects identified in this court's order of September 15, 2015.

3.

As for plaintiffs' slightly more specific allegation regarding Hinton's divorce settlement, this allegation fails to support a strong inference of scienter. This court's order of September 15, 2015, noted that Hinton transferred "138,770 shares on December 19, 2013, pursuant to a separation

8

agreement for his pending divorce[ ] and 10,000 shares on February 4, 2014, also pursuant to his pending divorce." [D.E. 52] 4. However, the court also held that these "two sales [did] not raise an inference of scienter because they were made pursuant to a final division of martial assets in conjunction with the Reporting Person's pending divorce." Id. (quotation omitted).

The court adopts the conclusion it reached in its order of September 15, 2015, regarding these sales and finds that plaintiffs' expanded allegation that Hinton obtained "considerable savings . . . by transferring shares at an artificially inflated price to his wife" is not sufficient to support a strong inference of scienter. See [D.E. 52] 24; Teachers' Ret. Sys. v. Hunter, 477 F.3d 162, 184 (4th Cir. 2007); Ronconi v. Larkin, 253 F.3d 423, 435 (9th Cir. 2001). Plaintiffs have failed to plead sufficient facts to negate other, more likely inferences regarding these sales, including that Hinton transferred his shares due to an agreement or court order requiring a transfer on those dates or that Hinton's ex-wife requested the transfer on those dates. Accordingly, this allegation, even when viewed holistically and in conjunction with the remainder of the amended complaint, does not aid in curing the defects identified in this court's order of September 15, 2015.

4.

Finally, plaintiffs argue that the court's order of September 15, 2015, necessitates a holding that plaintiffs have sufficiently pleaded scienter. See Am. Compl. ¶ 36; [D.E. 62] 1 ("Defendants' scienter is undeniable: the Court already has found it was material and misleading to represent the new FP&L contract [as] a renewal . . . ."). As discussed, this court's order of September 15, 2015, held that plaintiffs had sufficiently pleaded that Hinton's August 7, 2013 statement "was materially misleading." [D.E. 52] 13. In making this determination, the court stated that "a reasonable investor might find the distinction between [a renewal of an existing contract and the signing of a new contract] as having significantly altered the total mix of information." Id. 13–14. However, this

court's order then stated explicitly that plaintiffs had failed to sufficiently allege scienter. See id. 21–26.

Plaintiffs posit that, because a reasonable investor would find the difference between a contract renewal and a new contract material, "Hinton, the CEO and President of PowerSecure since 2007 with vast experience in the utility and power generation business," must "certainly" have known of this difference when he made the August 7, 2013, statement. Am. Compl. ¶ 36. Plaintiffs concede that they "certainly [are] aware of the Court's prior ruling with respect to scienter." [D.E. 62] 20. However, they claim that "the inference of scienter is not only strong, it is inescapable" in light of a sufficiently-pleaded materially misleading statement. See id.

It is odd that plaintiffs read an order holding that they failed to sufficiently plead scienter to "inescapably" require a holding that plaintiffs sufficiently pleaded scienter. In any event, the court rejects plaintiffs' reading. As defendants persuasively note, the material misrepresentation and scienter requirements of the Exchange Act serve separate and distinct purposes. See [D.E. 66] 14–15; Matrixx Initiatives, 563 U.S. at 43–44 (holding that the material misrepresentation requirement is objective and focuses on the reaction a reasonable investor would have to the statement); Tellabs, Inc., 551 U.S. at 319 (holding that scienter asks whether a reasonable person would deem the inference that the defendant had a "mental state embracing intent to deceive, manipulate, or defraud" at least as likely as any alternate inference) (quotations omitted)); Zak, 780 F.3d at 613 (noting that the scienter requirement "prevents section 10(b) from devolving into a penalty for business decisions that, in hindsight, appear questionable"). To suggest that sufficiently pleading a material misrepresentation automatically pleads scienter would read scienter out of the Exchange Act and would conflict with the statute and binding precedent.

Plaintiffs clarify in their opposition to defendants' motion to dismiss that they do not

10

"contend . . . that an inference of scienter automatically is established every time a material misstatement is properly pled." [D.E. 62] 27. Instead, they argue that "Hinton's, and thus the Company's, scienter is obvious," presumably due to the nature of the misrepresentation. Id.

The court acknowledges that a material misrepresentation may be so obvious as to render any competing inference regarding a defendant's scienter equally as reasonable or less reasonable than the inference supporting scienter. See Berson v. Applied Signal Tech., Inc., 527 F.3d 982, 987–89 (9th Cir. 2008). However, the court's order of September 15, 2015, necessarily rejected this possibility as to defendants' August 7, 2013 statement. See [D.E. 52] 21–26; see also Tellabs, Inc., 551 U.S. at 319; In re Level 3 Commc'ns, Inc. Sec. Litig., 667 F.3d 1331, 1344–46 (10th Cir. 2012). Here, the court again holds that plaintiffs' sufficiently pleaded material-misrepresentation allegation does not alone sufficiently plead scienter.

Additionally, plaintiffs attempt to invoke the core-operations doctrine to support this argument. See Am. Compl. ¶¶ 35–36, 38–43 ("At all relevant times, Defendant Hinton was the most senior executive officer at the Company . . . and was responsible for overseeing its business and operations day-to-day. The matters here at issue concerned one of the Company's two most important business segments."); [D.E. 62] 28–30. The court, however, rejects the applicability of the core-operations doctrine for the reasons described in its order of September 15, 2015. See [D.E. 52] 22 n.5; see also Yates v. Mun. Mortg. & Equity, LLC, 744 F.3d 874, 890 (4th Cir. 2014); S. Ferry LP, No. 2 v. Killinger, 542 F.3d 776, 785–86 (9th Cir. 2008) (holding that the core-operations doctrine applies only "in rare circumstances[,] where the nature of the relevant fact is of such prominence that it would be 'absurd' to suggest that management was without knowledge of the matter"). Accordingly, the court holds that the plaintiffs have not sufficiently pleaded scienter.

Plaintiffs have failed to "state with particularity facts giving rise to a strong inference that

11

the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A). Thus, the court grants defendants' motion to dismiss plaintiffs' claim under section 10(b) of the Exchange Act and Rule 10b-5.

B.

Plaintiffs also allege that Hinton violated sections 20(a) and 20(b) of the Exchange Act. Am. Compl. ¶¶ 73–79. In light of the disposition of plaintiffs' section 10(b) and Rule 10b-5 claim, the court dismisses these counts and the complaint as a whole. See, e.g., Cozzarelli, 549 F.3d at 628.

C.

As for defendants' motion for judicial notice and notice of incorporation by reference [D.E. 57], the court has not relied on these documents. Accordingly, the court denies the motion as moot.

III.

In sum, the court GRANTS defendants' motion to dismiss [D.E. 54] and DISMISSES plaintiffs' amended complaint. Additionally, the court DENIES AS MOOT defendants' motion for judicial notice and notice of incorporation by reference [D.E. 57].

SO ORDERED. This 13 day of September 2016.

JAMES C. DEVER III
Chief United States District Judge